Eunice W. Copen, *et al.*

*v.*

M. H. Hix, *Clerk of the Circuit Court of Kanawha County,* Board of Review of the West Virginia Department of Unemployment Compensation, *et al.*

(No. 9886)

Submitted May 6, 1947. Decided June 24, 1947.

*T. C. Townsend* and *John T. Keenan,* for petitioners.

*Leo Loeb,* for C. S. Davis, Director of West Virginia Department of Unemployment Compensation.

*Scherer, Bowers & File,* for C. H. Mead Coal Company.

*Jackson, Kelly, Morrison & Moxley, amicus curiae,* for West Virginia Coal Association.

KENNA, JUDGE:

The claim of Eunice W. Copen and that of Andrew J. Underwood to unemployment compensation benefits come here from the Circuit Court of Kanawha County on certiorari directed to M. H. Hix, clerk of that court. It is stipulated between counsel representing the C. H. Mead Coal Company in whose operations at East Gulf, Raleigh County, a stoppage of work from which the unemployment of claimants arose is alleged to have occurred, and counsel representing Copen and Underwood and a number of other persons similarly situated, that the final decision of the two cases now before this Court shall control the disposition of approximately two hundred like cases listed and identified in this record. The deputy director of unemployment compensation decided against the claimants, his finding was reversed by the department trial examiner, the Board of Review of the Unemployment Compensation Department by a *divided decision* reversed the finding of the trial examiner and the Circuit Court of Kanawha County affirmed its decision, so that the claimants are now the petitioners on certiorari before this Court.

It is uncontroverted that the stoppage of work was due to a labor dispute, evidenced by a strike of the local union

of United Clerical, Technical and Supervisory Employees, spoken of hereinafter as Foremen's Union, an affiliate of District 50 of the United Mine Workers of America, commencing on March 30, 1944, and lasting through April 17. The questions for decision are whether the claimants under Section 4(4), Article 6, Chapter 76, Acts of the Legislature, 1943, being, and hereinafter referred to as Code, 21A-6-4(4) (Michie, 1943), had satisfied the director that they were not participating, financing or directly interested in the admitted labor dispute and did not belong to a grade or class of workers who were participating, financing or directly interested in that dispute. A question that we regard as being now collateral is whether claimants left work voluntarily without good cause involving fault on the part of the employer, under the provisions of subsection 1 of the same section. It is uncontroverted that each of the applicants at the time of the work stoppage was a member in good standing of Local 6109 of the United Mine Workers of America to which all of the workmen, as distinguished from supervisory employees, of the C. H. Mead Coal Company in the operations here involved belong.

From the transcript of the testimony it appears that on March 29, 1944, a committee of four representing the local of the Foremen's Union, accompanied by Nick Aiello, Vice President of District 29 of the United Mine Workers of America, within and under the jurisdiction of which were all of the unions to which the employees of the C. H. Mead Coal Company belonged, excepting the Foremen's Union, called on S. R. Scholl, general superintendent of the three operations of the coal company at East Gulf, and asked him to negotiate with them as representatives of their union in order to agree upon the terms of the contract for the year ensuing after March 31. Scholl testifies that he was informed by the committee that Nick Aiello was their representative and spokesman. Scholl told them that he would be glad to discuss complaints with them as individuals but that he was not authorized

to and would not negotiate with them as representatives of the Foremen's Union.

A foremen's strike was called to begin the morning of March 30, 1944. On the afternoon of that day there was a meeting at Mullens, which was attended by members of the Foremen's Union as well as by members of Local 6109, United Mine Workers of America, the admitted purpose being to encourage the striking foremen. Nick Aiello presided and Edward Walker, President of Local 6109 of the United Mine Workers, attended. Both addressed the meeting and urged the rank and file of the membership of the United Mine Workers to cooperate with and support the striking foremen. A number of those in attendance at the meeting were identified by different witnesses as belonging either to the Foremen's Union or to Local 6109.

On April 2, 1944, there was a similar meeting at the courthouse in Beckley. The attendance filled the court room and was comprised largely of members of Local 6109, though there were several members of the Foremen's Union at the meeting. This meeting also was addressed by Nick Aiello and by Edward Walker, who spoke as representatives of the United Mine Workers of America, as well as John McAlpine, President of the Foremen's Union.

On the following morning the foremen gathered at the bath house pursuant to a request from Scholl, general superintendent, to meet him. The testimony concerning this meeting is rather vague and indefinite, but it appears that Scholl and a man by the name of Ruffini were met before they reached the bath house by a committee representing the assembled foremen and that after having talked with the committee they did not attempt to talk with the foremen. The foremen then went to a sand pile near the bath house where they met Nick Aiello and, after being told by him to go home and forget it, disbanded.

Copen testifies that he worked on the night of March 29 but that when he reported for duty at the usual hour for

his shift the afternoon of March 30 word had been left by the foreman of the machine men at the outside office of the mine foreman, as was customary, that there was no work in Copen's sections. This, according to Copen, was due to the fact that the coal he had cut the night before had been "shot" but not removed from his sections. Copen says that all that he knew about the strike was what he had heard to the effect that the "bosses" were quitting and that as far as he knew his union had no notice of the strike. He says that he didn't ask for other work and that they didn't offer him other work, but he knows that they didn't have bosses there. He says he reported to the general superintendent during the idle period on a day of which he is not certain and was told that there was no work. He then asked for a release and was refused. He says that he reported for duty on the day that the mine was supposed to start operating again and was told by Eller, mine foreman of No. 3 operation, in which he usually worked, that his section was not working that day. These are the only two occasions that Copen can distinctly remember reporting for duty after March 30, but he says that there were several others.

Underwood testifies that he reported for duty at the usual hour on March 30, he being a coal cutter's helper, and was told at the office by his boss that there was no work, so he got in his car and went home. He knew at that time of no trouble between the management and Local 6109 and knew nothing of the Foremen's Union strike. He went back on Saturday, which was pay day, and was again told that there was no work. He then asked Scholl for a release and was refused. He says that during the idle period he called the supply house every morning and was told "nothing doing." He does not identify the persons that he talked with over the telephone. His boss was Lester Eller. He did not ask Scholl for work when he reported to him on Saturday but asked only for a release.

Estle Mills, an extra main line motorman, one of the

claimants, testifies that he reported for work on the thirtieth of March and was told by Eller that they had no bosses that morning and it looked like they were going home. During the idle period he asked Edgar Stanley, Assistant Superintendent and Safety Director, concerning work and was told that he could tell him nothing. He understood that the reason the mines closed down was on account of the foremen's strike.

James White, another claimant, who is a coal loader, testifies that he reported for duty on March 30 and was told by Eller that there was no work for him as a coal loader that day. He went to the bath house on Saturday morning and there was no one there. On Monday morning he started back and got to the tipple where somebody told him there was no work.

The Board of Review held that the claimants were ineligible due to the fact that the unemployment for which they sought compensation existed because of a labor dispute and that the claimants were participating, financing and directly interested in that dispute and also belonged to a grade or class of workers who were participating, financing or directly interested in the labor dispute. The Circuit Court of Kanawha County affirmed this holding, stating correctly that a finding of fact by the Board of Review upon appeal is accorded the same weight as is the finding of fact of the trial chancellor. Section 21, Article 7, Chapter 76, Acts of the Legislature, 1943 (Code, 21A-7-21 [Michie, 1943]). However, it will be noted that the Board of Review found affirmatively that claimants were participating, financing and directly interested in the labor dispute that had caused the work stoppage, whereas the reading of the statute is to the effect that there shall be no award for a week in which the claimant's unemployment is due to a stoppage of work because of a labor dispute unless the director is satisfied that the claimant is not participating, financing or directly interested in the dispute and did not belong to a grade or class who were. We are of the opinion that under

the plain wording of the statute establishing the fact that the unemployment for which compensation is claimed arose because of a labor dispute, without more, disqualifies all claimants for unemployment compensation. If they can satisfy the director that they were not involved in any of the manners specified in the act, then their ineligibility is removed and their claim considered. The burden plainly is placed upon the claimant by the showing that the work stoppage exists because of a labor dispute. The wording of the Board of Review's opinion indicates that their participation was affirmatively shown by the C. H. Mead Coal Company in resisting an award. This we believe is technically incorrect. The decision should have rested upon the failure of the claimants to satisfy the director that they were not participating. It will be noted that the act, in terms does not require the claimant to prove a negative, but merely to "satisfy" the director.

The claimants as members of the United Mine Workers Local No. 6109 in District 29, have no direct relationship nor affiliation with Local 303 of the Foremen's Union. However, they both belong and contribute financially to the same national organization headed by the President and Executive Board of the United Mine Workers of America.

The organization in District 50, with which the Foremen's Union is affiliated, apparently embraces many other occupations that are not here involved, but the fact of it being a unit of the United Mine Workers of America is beyond dispute. There is no doubt that the United Mine Workers of America was participating, financing and directly interested in the labor dispute that resulted in the work stoppage with which we are here concerned. The problem that we are confronted with is whether the United Mine Workers of America, through its system of subdivisions and divided subdivisions represented by district and local organizations, can be said to separate its organization so that the different units of the national

organization each constituted a grade or class of workers separate and distinct from the rest within the meaning of our Unemployment Compensation Law. Remembering that under our view of the statute the burden rests upon the claimants to show that they do not belong to a grade or class participating, financing or directly interested in the labor dispute, we are of the opinion that "grade or class" is a term coextensive with the national jurisdiction of the organization to which the claimant belongs and to which the local union of which he is a member is subservient. The same is true of those directly participating in a labor dispute. If their interests do in fact integrate, the point of integration, whether local, state, or national, is not controlling. It is the fact of having a common interest. To hold that a member of the United Mine Workers of America is of a different grade or class than the other members of that organization, in the absence of a distinct, plain showing that that is a fact, would be to fly in the teeth of what has been common observation for a decade. True, United Mine Workers of America is a national organization, but it is also true that it exercises supreme power over its numerous units. It is financed by them and it assists in the financing of the labor disputes in which they become involved. Sympathetic strikes and boycotts are used as implements. While we do not believe that in its true sense a grade or class necessitates membership in a recognized organization, yet, conversely, the proof of membership in an organization directing, participating in, indorsing, and if necessary financing, a strike which causes a work stoppage we think certainly places a member in the same grade or class as the other members of the organization, whether it be local, state, or national. As stated, in our opinion the term "grade or class" is coextensive with the circumstances of each particular case and is to include all who were participating, financing or directly interested in the labor dispute involved. In our opinion, membership in the United Mine Workers of America constituted the grade or class to which the members of the striking Foremen's Union and all members of

Local 6109, including claimants, belonged, so that they were all ineligible for unemployment compensation awards for a work stoppage which existed because of a labor dispute in which, as members of an organization, they took an active part.

What has been said concerning the claimant belonging to a grade or class is equally applicable to them each as individuals participating, financing or directly interested in such labor dispute because if their organization financed by the dues of its members participating as such in the work stoppage by encouraging it, supporting it, and cooperating with it, the members of their organization cannot divorce themselves from direct involvement without showing a contemporaneous disapproval of the organization's activities. That does not appear.

The remaining question is one on which the Board of Review expressed no opinion, as did not the Circuit Court of Kanawha County, and that is the question of whether or not there was an actual stoppage of work on March 31 at the operations of the C. H. Mead Coal Company. Stoppage of work means to each claimant that there was no work of the same kind, paying the same remuneration, available to him to the extent that it would be available under normal circumstances. Copen was a coal cutter and Underwood a helper of a coal cutter. They were each paid on a tonnage basis for the coal mined as a result of the operation of the cutting machines with which they worked. It appears from this record that this was regular daily employment, each being assigned to cut coal in various "sections" of operation No. 3. It seems to have been within the power of the mine foremen to assign them different sections to work in if there was no work in the particular section named in their current assignment, although it was the duty of the mine foremen to notify them if their sections were changed. Both claimants testify that they reported for duty on March 30 and were told that there was no work. The general superintendent testifies that this was contrary to his instructions, that

operation 3 where they both reported had been "fire bossed" for each shift on March 30, and that his orders to the mine foremen remaining on duty and not striking were to assign work to each person desiring employment that day. His testimony is corroborated by his assistant and safety director and by Eller, the mine foreman of operation No. 3. There is also testimony tending to corroborate that of the claimants to the effect that persons reporting for duty that day were told by a foreman of their section that there was no work. What evidently gave rise to this conflict in the attitude of the foreman was the fact that it was the Foremen's Union that was on strike, and in at least two instances it definitely appears that it was a striking foreman who informed the claimants that there was no work. Neither Copen nor Underwood definitely identifies the foreman who told him that on March 30 there was no work, although they both testify to circumstances indicating that the general superintendent confirmed that report. The question presented is whether under Subsection 1, Section 4 of Article 6 of Chapter 21-A, Code, these claimants "left work voluntarily without good cause involving fault on the part of the employer * * *." The superintendent, assistant superintendent, and mine foreman of operation 3 all testify that there was available work for coal cutters, assistants, and coal loaders on March 30, that they had a sufficient force of certified men to have lawfully supervised mining operations on that day and that the cars for the man trip were waiting at the mine's mouth; they say that the six or eight certified men that were on duty examined the operations on March 30, to be certain that in the working places there were no harmful gases and that the ventilating system was functioning properly ("fire bossed") as required and that the same could have been done on every day men reported for work; that the certified men would have acted as mine foremen if workers had reported, using uncertified men temporarily as section foremen, as is allowed.

We do not believe that it is a matter of particular con-

sequence, in the light of the fact that the holdings of the Circuit Court and of the Board of Review are being affirmed, to decide whether the unemployment of claimants was voluntary, but we do believe that the question merits discussion inasmuch as it does relate, at least collaterally, to the question of whether they participated in or belonged to a grade or class of workmen who did participate in the strike of the Foremen's Union. If they reported for duty bona fide and were really seeking work, knowing that the Foremen's Union strike was then in effect, that fact might throw considerable doubt upon their participating, financing, or being directly interested in that labor dispute. So without going into a great deal of detail we wish to say that in our opinion there was available work of the same kind and at the same pay, although not in the same section, for both of these claimants on March 30.

For the foregoing reasons the judgment of the Circuit Court of Kanawha County is affirmed.

*Affirmed.*

RILEY, JUDGE, dissenting:

After careful consideration of the record, I respectfully dissent from the opinion of the majority of the Court in holding that the Board of Review of the West Virginia Department of Unemployment Compensation was justified in its finding that claimants did not sustain the burden of proving that they were not "(one) participating, financing or directly interested in" the labor dispute between the supervisors' union and C. H. Mead Coal Company, "and (two) did not belong to a grade or class of workers which was participating, financing or directly interested" in such dispute.

With deference I entertain the opinion that the majority of the Court has not given proper weight to the benign purposes of the Unemployment Compensation Law (Acts, West Virginia Legislature, 1943, Chapter 76),

as expressed by the Legislature in Article I, Section 1 of the Act, as follows:

> "The purpose of this chapter is to provide reasonable and effective means for the promotion of social and economic security by reducing as far as practicable the hazards of unemployment. In the furtherance of this objective, the legislature established a compulsory system of unemployment reserves in order to

> "(1) Provide a measure of security to the families of unemployed persons.

> "(2) Guard against the menace to health, morals, and welfare arising from unemployment.

> "(3) Maintain as great purchasing power as possible, with a view to sustaining the economic system during periods of economic depression.

> "(4) Stimulate stability of employment as a requisite of social and economic security.

> "(5) Allay and prevent the debilitating consequences of poor relief assistance."

Thus we see that the Act is not only remedial in its nature, but it conserves the public good and general welfare. By legislative fiat its purpose is the protection of those engaged in labor from the disaster of casual unemployment. Properly construed and applied, it serves to deaden the impact which such unemployment will have from time to time upon the economic structure of the State and Nation. The Act should, therefore, be liberally construed and applied. Lewis' Sutherland Statutory Construction, 2d Ed., Section 582. And this is so though the unemployment compensation benefits are financed by the employer, and therefore the statute has some of the attributes of a tax law. 3 Horack, Sutherland Statutory Construction, 3d Ed., Section 7211. The Court of Appeals of Georgia in *Young* v. *Bureau of Unemployment Compensation,* 63 Ga. App. 130, 10 S. E. 2d 412, in construing a preamble setting out the purpose of the Georgia Act, which has the same purport as the West Virginia Act, said: "The courts, as well as the administrator of the unemployment law, in

construing and applying the provisions of such law, must liberally construe and apply such law in the light of the public policy of this State as declared in Section 2 of the act. The Court shall be guided by the fact that the unemployment compensation law is intended to provide some income for persons who are, without any fault of their own, temporarily out of employment." The Supreme Court of Washington in *Wicklund* v. *Commissioner of Unemployment and Placement, Groves* v. *Same*, 18 Wash. 2d 206, 138 P. 2d 876, said: "The Legislature never intended that unemployment compensation should be denied to employees because of a labor dispute which they did not initiate or further, the cause of which unemployment they and their independent organization were powerless to avert." See generally *Miners in General Group* v. *Hix*, 123 W. Va. 637, 657, 17 S. E. 2d 810, and the dissenting opinion at page 658.

With the foregoing principles in mind, it is quite difficult for me to see how the trial court, under the facts contained in this record, arrived at its finding that the claimants participated in a labor dispute between the supervisors and the coal company. On the contrary, I am of opinion that the claimants clearly and affirmatively sustained the burden of proof that there was no such participation on their part. True, there was a work stoppage on March 30, 1944, but it was a work stoppage growing out of a labor dispute between members of the supervisors' union and the coal company. This record clearly shows that on the day of the work stoppage and throughout the period thereof, there was no dispute or controversy of any kind between the coal company and the local union (Local No. 6109), or its members. Claimants testified that there was no such dispute, though the work stoppage came about over a lack of supervision at the mines of the coal company which, in turn, was caused by a controversy between the supervisors and the company. In this regard it may be well to state that Local No. 6109 is an affiliate of District No. 29 of the United Mine Workers of America, which district comprises a number of local unions whose members

are mine workers, as distinguished from supervisors, and the members of the supervisors' union, known as United Clerical & Technical Supervisors' Union, is an affiliate of District No. 50 of the United Mine Workers of America, which is composed of unions, none of which has mine workers as members. The uncontradicted affidavit of John McAlpine is to the effect that the supervisors' union is autonomous. There is no connection with the local union of which claimants are members and the supervisors' union.

In support of the judgment of the circuit court an effort is made to show the structure and make-up of the United Mine Workers of America by reference to the statement of facts contained in the decision of the National Labor Relations Board in *In re Jones & Laughlin Steel Corporation*, 66 N. L. R. B. 386, 17 L. R. R. N. 304, but that case is independent of the one under consideration and the matters contained in the former have no place in this record, and should not have been relied upon in the appraisal of the instant case.

Now, what are the facts bearing on the question whether claimants participated in the dispute? The word "participating," as used in the statute, involves the element of affirmative activity. Black's Law Dictionary, Third Ed., 1328; 31 Words and Phrases, Perm. Ed., 132-134, inclusive; *Martin* v. *Mutual Life Ins. Co. of New York*, 189 Ark. 291, 71 S. W. 2d 694. If these claimants had struck in sympathy with the supervisors, of course, they would have participated, but that is not the situation disclosed by this record. Mine No. 3, in which claimants worked as coal cutters, was not fire bossed after April 1, 1944, until in response to a notice posted by the coal company, claimants returned to work on April 17, 1944, under a new set of supervisors. This latter date seems to be the first date upon which sufficient supervisory forces were available at that mine. It is from the testimony of officials of the coal company that I draw the conclusion that there was not sufficient supervision of the mine during the time of the work stoppage, and in the absence of which, the failure of

claimants to work would not of itself be a participation in the independent labor dispute. The superintendent of the coal company, Scholl, testified that on March 30, 1944, of approximately forty men, who prior to that time were engaged in the supervision of the mine, all but six quit work and did not return until after April 17, 1944, when some of them at least returned and replaced the new supervisors. Even at the time the superintendent was testifying there were in mine No. 3 thirty to thirty-five certified men employed. It seems reasonable to say that if thirty or forty certified men were required adequately to supervise the mine, six would not be sufficient to operate the mine properly. But this is not my opinion alone. Edward Stanley, an assistant superintendent and safety director for the coal company, testified that during the period of work stoppage there were not sufficient certified men to take care of the work "adequately." If, in the opinion of the safety director, who evidently is a man experienced in the field of his endeavor, supervision of the coal company's mines was inadequate during the time of the work stoppage, it seems indeed unjust that miners who, by reason of the relative status of the two groups, would naturally rely upon the foremen for directions, should be compelled to enter the mine and mine coal without proper supervision, or failing to do so should risk losing their unemployment compensation benefits which are given to them under the benign provisions of the statute. This is particularly true in the instant case, because the coal company's mines are gaseous and inherently dangerous.

But in addition to the foregoing, as heretofore suggested, mine No. 3 was fire bossed only on March 30, 1944, and two days thereafter. In this State where a mine is not fire bossed a red signal is required to be placed outside the mine near its mouth. In fact, Code, 22-2-46, provides that it is unlawful for any person to enter a mine at the beginning of work on each shift until such signal has been given by the fire boss or bosses on the outside of the mine or mines as to the safety thereof, except "under the direction of the fire boss or bosses, and then for the purpose of

assisting in making the mine safe." Under this section of the Code it is a misdemeanor to enter a mine in the absence of such signal or direction by the fire boss or person authorized to do fire boss work. After the third day of the work stoppage there was no signal or direction to the effect that the mine was safe, and it would have been unlawful for claimants to enter the mine. Surely they were not to be compelled to commit a statutory misdemeanor as a condition precedent to the allowance of compensation.

But the coal company suggests, and its officials testified, that though there were not sufficient certified men during the work stoppage period to supervise properly the mine, uncertified men could be used under the direction of the certified men available. On the basis of this evidence it is contended that the coal company was always ready to furnish sufficient supervision for the "rank and file" miners. That may be true, but, nevertheless, the proper servicing of the mine and the furnishing of a sufficient supervisory force to render the mine comparatively safe, is a condition precedent to the duty of the men to proceed to mine coal. That the coal company was not prepared, or at least did not furnish sufficient supervisory force prior to the men entering the mine, is shown by the uncontradicted testimony of two witnesses. Clarence Perdue went to work on March 30, 1944, and though the man trip was not run, he entered the mine and proceeded to work, but a Mr. Boggess, a general mine foreman, sent him out of the mine because there were no "bosses" present. Hustie Ward also entered the mine on March 30 for the purpose of shooting coal. He had the coal upon which he was working almost shot down, when John Caters, a fire boss, told him there would be no work because there were no "bosses" that morning. Neither Boggess nor Caters was called as a witness in contradiction of this testimony, though their absence is not explained.

This record discloses that claimants appeared for work on March 30, 1944, and found that a sufficient supervisory force was not available, and thereafter on occasions they made inquiry concerning work and were told there was

no work. Claimants testified that they asked Lester Eller, the mine foreman for mine No. 3, whether work was available and were told by him that there was no work. Eller testified generally that he does not recall having any conversation with claimants concerning work. During the whole course of the work stoppage period claimants held themselves available for work, and promptly returned to work under new supervisors immediately after the posting by the coal company of notice that sufficient supervisory forces were present. If they were striking in sympathy with the old supervisors, why, it may be asked, did they return to work immediately upon posting of the notice, though the certified men who struck had not then been reemployed? So I do not think claimants' absence from work during the period in question constitutes participation in the controversy between the supervisors and the coal company.

Claimants, in my opinion, were not financing the independent labor dispute which existed during the work stoppage. The fact that part of the dues paid by the members of Local No. 6109 and the supervisors' union went into the treasury of the United Mine Workers of America is not such financing, in my opinion, as is contemplated by the statute. In fact, this record does not disclose that a single penny of that money was diverted to finance the dispute.

Likewise the position that these claimants were directly interested in the dispute cannot be sustained, in view of the express language of the statute. The qualifying word "directly" precludes any idea that an interest which would preclude claimants under the statute is merely sympathy or an abstract attitude of the mind. If that had been the intendment of the Legislature, the qualifying word would not have been used. Moreover, as indicating a clear legislative intendment that the word "directly" qualifying the word "interested" should be given significance, it is to be noted that in clause (one) of Chap. 1, Art. 6, Sec. 4, Acts, 1936, 2d Ex. Sess., uses the words "or interested in such dispute," which clause was amended, Acts, 1937, by in-

serting in said clause the word "directly" in qualification of the word "interested." The interest contemplated by the statute must be active, direct and concrete. It must be in furtherance of the dispute by participation or activity therein by claimants, and must be prompted by a desire to secure higher wages, better working conditions, or some other material interest in the success of the dispute. In *Wicklund* v. *Commissioner of Unemployment Compensation and Placement, supra,* the Supreme Court of Washington said: "The words 'directly interested in the labor dispute' are clearly limited in their application to those employees directly interested in furtherance of the dispute by participation and activity therein." In *Kieckhefer Container Co.* v. *Unemployment Compensation Commission,* 125 N. J. L. 52, 13 A. 2d 646, the Supreme Court of New Jersey gives the same import to the words "directly interested" as was given by the Court in the *Wicklund* case.

On the question of the interpretation of the words "directly interested," I do not think the fact that Nick Aiello, vice-president of District No. 29, who was deceased at the time of the hearing, spoke at meetings of the supervisors, at which he stated that the coal miners would cooperate with them for the purpose of effecting an organization, and on another occasion told the supervisors to go home and forget it, should bind these claimants. They were not present on those occasions. Local No. 6109, so far as this record is concerned, did not authorize him to speak for it; he simply held the office of vice-president of District No. 29, and, for all this record discloses, he may have been talking and acting on his own volition.

But, finally, it is contended in opposition to the instant claims that claimants belong to a grade or class of workers who are participating, financing or directly interested in the labor dispute which has resulted in a stoppage of work. In this regard I do not agree with the majority opinion that the fact that District No. 29 and District No. 50 are affiliated with the United Mine Workers of America

makes these claimants of the same grade or class of workers as the members of the supervisors' union. The statute says nothing about membership in a union, but specifically qualifies the words "grade or class" by the words "of workers." When the Legislature used the words "of workers," it expressed the intention that the difference in work and not in union membership is the controlling factor. It is reasonable to assume that the work of the supervisors is different and separate from the work of coal miners. By the very difference in the status of the two groups, the members of one group are necessarily over the other. To the effect that grade or class of workers, as used in the statute, does not justify the finding of the board of review on the immediate question, see *Kieckhefer Container Co. v. Unemployment Compensation Commission, supra.* See also Webster's International Dictionary, Second Edition, Unabridged, page 10085, and 18 Words and Phrases, Perm. Ed. 606. To say that because the two districts are affiliated with the United Mine Workers of America makes claimants of the same grade and class of workers with the supervisors is in derogation of the autonomy of the two districts and the two local unions, disclosed by this record, and, in my opinion, is in the teeth of the language and clear intendment of the statute.

From the foregoing it can be seen that I am not in accord with the third point of the syllabus, which practically makes union membership, as distinguished from grade or class *of workers* the controlling factor in the case. Under that point of the syllabus where parties seeking benefits under the Unemployment Compensation Law organize themselves for a common purpose, they are precluded from compensation whether that purpose is participating, financing or directly interested in a labor dispute, or some other sphere of activity.

The foregoing disposes of the question decided by the board of review. Neither that board nor the circuit court passed on the question whether claimants "left work voluntarily without good cause, involving fault on the part of the employer * * *." (Subsection 1, Section 4, Article

6, Unemployment Compensation Law). A finding on that question should have been made by the board of review and by the circuit court. This Court in the first instance should not determine non-jurisdictional questions which have not been acted upon by the court below. *Nuzum* v. *Nuzum,* 77 W. Va. 202, 87 S. E. 463; *State* v. *Sanney,* 91 W. Va. 477, 113 S. E. 762; *Vecellio* v. *Bopst,* 121 W. Va. 562, 6 S. E. 2d 708; *Billings* v. *State Comp. Comr.,* 123 W. Va. 498, 16 S. E. 2d 804. Nevertheless, as the majority of the Court in its opinion addressed itself to that immediate question, I take the liberty to say now, as I have heretofore indicated in this dissent, that claimants during the period of work stoppage were prevented from working through no fault of their own, and in general belong to that group of workers which the statute is designed to protect. *Miners in General Group* v. *Hix, supra,* page 657.

For the foregoing reasons I would reverse the judgment of the Circuit Court of Kanawha County, in affirming the action of the board of review.

Judge Lovins authorizes me to say that he joins in this dissent.