Henry Davis, C. S. Davis, *Director Employment
Security, et al.*

*v.*

M. H. Hix, *Clerk, Board of Review, Department
Employment Security, et al.*

(No. 10603)

Submitted September 7, 1954. Decided November 16, 1954.

*R. L. Theibert, M. E. Boiarsky, John G. Fox,* Attorney General, *Leo Loeb, Dean Heironimus,* for petitioners.

*Estep, Chambers & Smith, F. Paul Chambers, Mahan, White & Higgins, S. C. Higgins, Jr.,* for defendants.

BROWNING, JUDGE:

This Court granted writs of certiorari in these four cases to a judgment of the Circuit Court of Kanawha County denying claimants unemployment benefits for the period, February 6, 1950 to and including March 5, 1950. The Director of Employment Security joins with the claimants in their petition, and the defendants are: M. H. Hix, Clerk of the Circuit Court of Kanawha County; the Board of Review, West Virginia Department of Employment Security; and numerous coal companies against whom the charges for unemployment benefits, if allowed, would be made.

The individual claimants, on behalf of themselves and all others similarly situate and adversely affected by the decision of the Board of Review, subsequently upheld by the Circuit Court of Kanawha County, ask reversal of such judgment. It has been stipulated that the original unemployment of these claimants was not the result of a labor dispute; that the only period involved is that from February 6, 1950—March 5, 1950; and that the individual claimants are typical or representative of numerous others, similarly situate, who were allowed benefits by departmental deputies, but which awards were reversed by the Board of Review. All claimants had been declared ineligible to receive benefits immediately prior to February 6, 1950 on the ground that they were then unavailable for fulltime employment, inasmuch as the United Mine Workers of America, of which claimants were members, had directed that their members produce coal only three days a week, and each claimant declined to work more than the designated three days.

Beginning February 6, 1950, work in the coal mines was stopped completely. On February 11, 1950, the United

States District Court for the District of Columbia entered a temporary order restraining the United Mine Workers of America, et al., from "encouraging, causing or engaging in" any work stoppage at any of the defendants' mines. This order continued in effect until March 3, 1950, when a preliminary injunction of the same tenor was granted. Nevertheless, and despite the directives of the union officials, the members of the union refused to work until after a new contract was signed on March 5, 1950.

Claimants assert that they are eligible for unemployment benefits under the provisions of Chapter 1, Article 6, Acts of the Legislature, Second Extraordinary Session, 1936, as amended, hereinafter referred to as Code, 21A-6, which provides:

21A-6-1:
"An unemployed individual shall be eligible to receive benefits only if the director finds that:

"* * *

"(3) He is able to work and is available for full time work for which he is fitted by prior training or experience."

21A-6-6:
"Notwithstanding any other provision of this chapter, no work shall be deemed suitable and benefits shall not be denied to an individual, otherwise eligible, for refusing to accept new work under any of the following conditions:

"(1) If the position offered is vacant directly to a strike, lockout, or other labor dispute.

"(2) If the wages, hours, or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality.

"(3) If as a condition of being employed the individual would be required to join a company union or to resign from or refrain from joining any bona-fide labor organization."

On the other hand, the defendant employers contend, and the Board of Review and the Circuit Court of Kanawha

County found, that claimants are ineligible under 21A-6-1, and are disqualified under the provisions of 21A-6-4, which provides:

> "Upon the determination of the facts by the director, an individual shall be disqualified for benefits:
>
> "* * *
>
> "(4) For a week in which his total or partial unemployment is due to a stoppage of work which exists because of a labor dispute at the factory, establishment, or other premises at which he was last employed, unless the director is satisfied that he was not (one) participating, financing, or directly interested in such dispute, and (two) did not belong to a grade or class of workers who were participating, financing, or directly interested in the labor dispute which resulted in the stoppage of work.* * *"

The "sample cases" were heard by the Board of Review, West Virginia Department of Employment Security, in lieu of a trial examiner, upon appeal from the decisions of the departmental deputies, and, at the two hearings before the Board of Review, certain pertinent testimony was adduced as to the four individual "typical claimants", Henry Davis, William Gray, John Palmer and Walter Humphrey, as well as to circumstances leading up to the cessation of work in the coal industry for the period February 6, 1950—March 5, 1950. The evidence showed that the United Mine Workers of America is an unincorporated labor organization with a membership in excess of 400,000 persons; that all coal miners in the bituminous field, with few exceptions, are members thereof; that the four claimants were, at the time of the disposition of their cases, such members; that for several years prior to the initiation of this litigation, operators of coal mines in the United States, whose production workers belong to the United Mine Workers of America, have operated under industrywide collective bargaining agreements, negotiated between the collective bargaining representatives of the operating companies on the one side, and the International Union, United Mine Workers of

America, on the other; that the last of these agreements, prior to the period here involved, was known as the National Bituminous Coal Wage Agreement of 1948, which expired by its own terms on June 30, 1949; and that, thereafter, the pattern of work in the industry established by directives of the Union was as follows:

"June 30 to July 5, 1949—Vacation period—no work;

"July 5 to September 14, 1949—Three day week;

"September 15 to November 9, 1949—No work;

"November 9 to November 30, 1949—Six day week;

"December 1, 1949 to Feb. 6, 1950—Three day week;

"February 6 to March 5, 1950—No Work."

The evidence as to the individual claimants showed that Henry Davis was a coal miner by training and experience, forty-three years of age, and had spent twenty-six years working in and around coal mines; he became unemployed on March 11, 1949, by virtue of quitting his job with the Logan County Coal Corporation. He testified that he was unable to secure employment thereafter, although he sought such employment from several companies, and that during the February 6—March 5 period, he sought "to get on the county road". He testified that during that period, if work had been offered him by his former employer, he would not have worked, stating: "If the strike was on, no. There was not work for nobody. When it is contract time, there is no work. That is a work stoppage."

John Palmer, an employee of the New River Company was separated from his employment on November 23, 1949, the reason given therefor being "misconduct". He was forty-eight years of age and had been employed by the New River Company since May 3, 1934, and had a total of thirty-three years experience in the coal mining industry.

Walter Humphrey, also an employee of the New River Company, was separated from his employment on December 21, 1949, because of "lack of work". He had had seven

years experience in coal mining, and had briefly worked as a laborer for the State Road Commission. Both of these men testified that they would not have worked during this period. William Gray did not testify, but it was stipulated that he was a member of the United Mine Workers of America.

Ebersole Gaines, President of the New River Company, was asked the following question, and made the following answer: Q: "In your opinion, Mr. Gaines, during the period from February 6 to March 5, based upon your experience with the industry, do you think a labor dispute existed between the members of the union and the coal operators?" A: "Very definitely, yes, sir."

The Board of Review, in reversing the decisions of the deputies, finding the four typical claimants eligible for unemployment benefits, stated: "Therefore, this Board is of the opinion that these typical claimants, and the other claimants similarly situate as to the facts, participated in a labor dispute for the period in question, February 6 to March 5, 1950, and are, hence, disqualified to receive benefits. We, therefore, are of the opinion that in this case the claimants were, first, ineligible because they were not available for full time work, and secondly, disqualified for the period in question because of the labor dispute."

The decision of the Board of Review was affirmed by the Circuit Court of Kanawha County on December 30, 1952. Two opinions were prepared by the former judge of that court, the first on the 26th day of April, 1951, and the second on the 9th day of October, 1952. In the latter, the judge stated: "I may say quite frankly that my belief in the correctness of my original decision has been shaken somewhat by the extensive briefs of counsel for the claimants and the Department of Employment Security; however, as logical and persuasive as the arguments set forth in these briefs may be, yet I find myself unable to fully accept the 'new work' theory stressed by counsel as applied to these cases.* * *"

The record clearly establishes the fact that these claimants were able to work, and available for full time employment for which they were fitted by prior training and experience for the period in question, but that each stated that he would not work because of the labor dispute then in progress. The respondents contend, and the Board of Review and the Circuit Court of Kanawha County have held, that petitioners were not made eligible under Code, 21A-6-1 (3), inasmuch as the employment they refused to accept was not "new work".

Under the decisions interpreting provisions similar to the West Virginia Employment Compensation Statute, it has been established that one of the requirements of being available for full time work is that such person must be genuinely attached to the labor market. In *Fleiszig* v. *Board of Review of Division of Unemployment Compensation of Department of Labor*, 104 N. E. 2d. 818, 821, 412 Ill. 49, it was held that the phrase "available for work" in a statute requiring an unemployed person to be "available for work" in order to be eligible for unemployment benefits, is designed to test such person's continued and current attachment to labor force. To the same effect are *Walton* v. *Wilhelm*, (Ind.), 91 N. E. 2d. 373; *Kentucky Unemployment Ins. Commission* v. *Henry Fischer Packing Co.*, (Ky.), 259 S. W. 2d. 436, 440; *Schettino* v. *Administrator, Unemployment Compensation Act*, 83 A. 2d. 217, 220, 221, 138 Conn. 253. However, Code, 21A-6-6, provides that: "Notwithstanding any other provisions of this chapter, no work shall be deemed suitable and benefits shall not be denied under this chapter to any otherwise eligible individual for refusing to accept new work under any of the following conditions: (1) If the position offered is vacant due directly to a strike, lockout, or other labor dispute * * *." That the language, "Notwithstanding any other provisions of this chapter" in Code, 21A-6-6, requires that such section and Code, 21A-6-1, be read *pari materia,* is obvious. No unemployed individual is to be denied benefits because of ineligibility under Code, 21A-6-1, if he is exempted from accepting employment as defined by

Code, 21A-6-6. The crux of Code, 21A-6-6, is the phrase "new work". All of these petitioners had been separated from their employment for a long time prior to the work stoppage of February 6—March 5, which resulted from a labor dispute. None had been employed between the time of their original separation and the end of the work stoppage. Two continued unemployed subsequent to March 6, and two were reemployed on that date.

The Legislature of this State did not see fit to define "new work", and little helpful judicial determination of the meaning of that phrase, as applied to unemployment compensation statutes, is found elsewhere.

In *Brown-Brockmeyer Co.* v. *Holmes,* (Ohio), 89 N. E. 2d. 580, the issue before the court was whether a former employee, who had quit work and voluntarily removed himself twenty-three hundred miles from the location of his base employer, was justified, under a provision of the Ohio Act to the effect that an individual was not disqualified from benefits if the work offered was at an unreasonable distance from his residence, in refusing employment by his former employer which had been continuously available to him, subsequent to quitting work with that employer. "* * * In the opinion of this court the term, 'new work,' applies to work other than that offered by the base employer and not to employment of the base employer whose employment the employee has left. In other words, the employee does not lose his rights to benefits if the new employment offered, after he has severed his employment with the base employer, is at an unreasonable distance from his residence. If the base employer is ready and willing to continue the employment, the employee, by voluntarily moving away from the employment without just cause, necessarily waives his right to benefits to unemployment compensation as to his former employer in case the employee later becomes unemployed." The facts in that case clearly distinguish it from the instant cases before this Court.

In *Buckeye Coal Co.* v. *Unemployment Compensation Board of Review,* 161 Pa. Super. 594, 56 A. 2d. 393, the

claimant, a member of a local union of the United Mine Workers of America, whose original unemployment was due to a voluntary suspension of work resulting from an industrial dispute at the establishment where he was last employed, was held not ineligible for benefits because he failed to accept "suitable work". Under the Pennsylvania Act, claimant was entitled to benefits after a "waiting period". The court said: "The claimant was not ineligible for compensation as having failed to accept 'suitable work'. The so-called suitable work offered was *by the employer whose men, including the claimant, had suspended work because of an industrial dispute.* To call this 'suitable work' * * * is * * * in the teeth of the definition of 'suitable work' in * * * the Act * * * that notwithstanding any other provisions of that subsection, no work shall be deemed suitable 'in which (1) the position offered is vacant, due directly to a strike, lockout, *or other labor dispute* * * *'."

This Court in *Miners* v. *Hix*, 123 W. Va. 637, 17 S. E. 2d. 810, in an opinion written by Judge Fox, stated: "* * * The assessments made to build up a fund to take care of benefits to which workers would be entitled, when unemployed, must be assumed to have been created on the idea of involuntary unemployment. Refusal to work is not, ordinarily, involuntary unemployment, although under our statute refusal to work under some conditions does not bar benefits.* * *" The reference undoubtedly was to Code, 21A-6-6.

In *Bergen Point Iron Works* v. *Board of Review of Unemployment Compensation Commission et al.,* (N. J.), 61 A. 2d. 267, the first syllabus point is as follows: "The Unemployment Compensation Law is remedial and should be construed in the light of its stated purposes." The court in the opinion stated: "* * * such work at a struck plant is not deemed suitable and benefits may not be denied on account thereof to a claimant who is otherwise eligible. * * *" The New Jersey and West Virginia statutes upon this point are identical.

The facts in the case of *Tucker* v. *American Smelting & Refining Co.,* 189 Md. 250, 55 A. 2d. 692, are similar to, though not identical with, those of the instant cases. There, the employer had several mining plants in various states, including Utah and Maryland, and the employees of those plants, as well as those in other states, were members of an "International Union". Employees at the Utah plant, which supplied the Maryland plant with materials went on strike, compelling the employer to lay off a number of employees in the Maryland plant. Thereafter, the union called a strike at the Maryland plant, and the evidence indicated that claimants, if they had been called back to work, would have participated in the Maryland strike by refusing to cross the picket line. The claimants were held eligible, the court saying: "* * * Claimants unemployment was due directly to lack of work before the Baltimore strike and not the stoppage of work because of the Baltimore strike. Claimants therefore are not disqualified.* * *"

The Board of Review in its opinion said in part that: "* * * properly construed, Code 21A-6-6 (1) protects a *stranger* to a labor dispute from having to accept new work vacant because of a lawful strike, and not participants in an unlawful work stoppage.", and, "We are of the opinion this section Code 21A-6-6 (1) was intended to protect *strangers* to a labor dispute from having to accept 'new work' vacant because of a lawful strike. The Courts, both Federal and State, have impliedly, at least, so held by denying benefits to those participating in labor disputes. * * *", (Italics supplied.), citing *Miners* v. *Hix, supra; Unemployment Compensation Commission* v. *Aragon, et al.,* 329 U. S. 143, 91 L. Ed. 136; and *Copen* v. *Hix,* 130 W. Va. 343, 43 S. E. 2d. 382. Of course, a claimant is disqualified for benefits under the provisions of Code, 21A-6-4, if his unemployment is due to a stoppage of work which exists because of a labor dispute at the establishment at which he was last employed, in which he is a participant, but the vital question to be determined in these cases is whether petitioners were "participants" in, or "strangers" to, the labor dispute. Certainly, the deci-

sions of this Court, cited by the Board and Circuit Court are not in point, and neither is the *Aragon* case, as will subsequently be seen by an analysis of that decision, and the facts upon which it was predicated. We find no judicial determination of this precise question applicable to the factual situation in these cases.

From the language used in the Board's opinion, which was approved by the Circuit Court, it would appear that it had gone further and held that Code, 21A-6-6 (1) is not applicable unless an individual, unemployed for reasons other than a labor dispute, refuses to accept "new work" in an *industry* in which he had not theretofore been employed. The opinion of the Board said: "Therefore, in view of the facts of this case the claimants are not strangers to this dispute but are participants and work in the coal mining industry is not 'new work' but is their usual and customary work and the only work, for the most part, for which the claimants are 'fitted by prior training and experience.' " That decision apparently means that all persons unemployed, for reasons other than a labor dispute, are disqualified from receiving benefits for any period in which a work stoppage occurs at any mine in the vicinity of the residence of such unemployed person, unless that person will agree to accept employment where a labor dispute is causing a work stoppage, even though other mines in the vicinity are continuing to operate. In other words, such an interpretation of the Unemployment Compensation Statute would make the provisions of Code, 21A-6-6 (1) applicable only to unemployed individuals who had never previously worked in the coal mining industry. Such an interpretation would make an unemployed individual ineligible for benefits even though the place of the work stoppage was one at which he had never theretofore been employed, and would make him ineligible regardless of the trade union whose members were participating in the work stoppage, since such work would not be "new work", inasmuch as it was the usual and customary work for which the unemployed person was fitted by prior training and experience. This Court cannot accept

this interpretation of the term "new work" as used in the statute.

An examination of the provisions of the Unemployment Compensation Act shows that the word "work" is used several times, and there is nothing to indicate that by its use therein the Legislature intended to apply to it the restricted meaning which has been given to it by the Board and the Circuit Court.

Respondents rely upon the recent Virginia case of *Unemployment Compensation Commission* v. *Tonko,* 192 Va. 463, 65 S. E. 2d. 524, wherein it was held that persons unemployed, due to causes other than a labor dispute, were not entitled to benefits during the period of the so-called "three day week" who refused to work more than the restricted period. As heretofore stated, all of the petitioners herein were likewise refused benefits during that period, and did not appeal from the decisions of the Trial Examiner to that effect. In the opinion in the *Tonko* case, the court said: "If a group of unemployed individuals may restrict their working schedule to three days per week and yet be deemed available for work so as to entitle them to unemployment benefits, why may not they, or another group, restrict their employment to one day per week, or even to a shorter period, and recover such benefits?" Assuming the Virginia court, and the Trial Examiner's rulings, to be correct in their conclusions that an individual or group of unemployed individuals may not restrict their employment to a certain number of working days a week and still be available for full time employment, as required by the statute, such decisions are not applicable to the facts in these cases, inasmuch as restriction of activity to a certain number of days a week is not a work stoppage. In the instant cases, it is clear from the record that there was a total cessation of work, and that the work stoppage was due to a labor dispute. A "diminution of work" is not a "work stoppage". The *Tonko* case, therefore has no application to the cases before this Court.

The Circuit Court in its opinion quoted from annotations to the *Unemployment Compensation Commission* v.

*Aragon, et al., supra,* case in 91 L. Ed. to this effect: "It has been generally held that a labor dispute or strike within the meaning of the disqualifying provision of an unemployment compensation act may exist in the absence of a contract, and without an employer-employee relationship between the disputants."

An examination of the authorities upon the subject indicates to this Court that it has been generally held to the contrary concerning the employer-employee relationship, as will hereinafter be observed. However, the facts in the *Aragon* case, *supra,* may be readily distinguished from those in the instant cases, as will be noted from a reading of the opinion by Mr. Chief Justice Vinson. The employees in that case were engaged in the seasonal activity of catching and canning salmon. Although the work was carried on in Alaska, the companies customarily hired their workers at San Francisco at the beginning of the season, transported them to the Alaskan establishments, and returned them to San Francisco at the end thereof. In 1939, a written agreement had been entered into between the companies and the union representatives of the workers, and at the end of that season the agreement then in effect was terminated by the employers, making necessary the negotiations of a new contract for the 1940 season. Negotiations for such new contract were not successful, and the employees, who were subsequently denied unemployment benefits, refused to work during the 1940 season. There is no reference to the phrase "new work" in the opinion, the decision having been based upon the question of whether there was a labor dispute within the meaning of the Alaskan Unemployment Compensation Act. The court held that there was a labor dispute, and benefits were denied. In the opinion, Chief Justice Vinson stated: "We think that there is evidence in the record to support the Commission's conclusion that respondent's unemployment was 'due' to a labor dispute in so far as that holding relates to the individual respondents employed in 1939 by the Alaska Packers Association and the Red Salmon Canning Company. At the hearings before the

Referee, the respondents attempted to establish that the companies called off their 1940 operations for reasons other than their inability to negotiate a satisfactory labor agreement.* * * There is evidence that the Alaska Packers Association expected to hire about two-thirds the number of workers in 1940 it had employed in 1939. But there is nothing in the record to establish that any of the claimants in this action would have been unemployed as a result of this contemplated curtailment in activity, or, if any of the respondents would have been affected, which of their number would have been unemployed. Under these circumstances, we think that the Commission's finding that the unemployment was 'due' to the labor dispute should stand in so far as it relates to the claimants indicated." However, the court then went on to hold that the employees of a third company, which had been involved in the negotiations, but which had withdrawn therefrom with the announcement that it was unable to send an expedition to Alaska in 1940, were not disqualified from receiving benefits by virtue of being unemployed "due" to a labor dispute at the establishment at which they were last employed. While the question of "new work" was not raised therein, the court in effect held that members of a union, which was one party to an industry wide labor dispute, were not ineligible for benefits because of unavailability for full time work, where their unemployment did not arise or result from such labor dispute.

Reliance is placed also by the respondents upon the case of *Muncy Foundry Div., etc.* v. *Board of Review*, Indiana, 51 N. E. 2d. 891, as did the Circuit Court which quoted therefrom as follows: "If unemployment is originally caused by lack of work but thereafter work becomes available at the factory, establishment or other premises where he was last employed, and the employee refuses to work because of a labor dispute at such place in which he was participating, he is thereafter disqualified for benefits under the Act." The quotation is from the syllabus of that case, and a reading of the opinion reveals that the syllabus has no application thereto, inasmuch as

the court found that no labor dispute existed, and unemployment benefits were awarded to the applicants. The language, even in the syllabus, "in which he was participating", would distinguish the case from those now before this Court.

The only other case cited in the opinion of the trial court is *Block Coal and Coke Co.* v. *United Mine Workers,* (Tenn.), 148 S. W. 2d. 364. It is not in point. The facts of that case are identical with those presented to this Court in *Miners* v. *Hix, supra.* In each case, the claimants for unemployment benefits had left their employment by reason of a labor dispute at the establishment at which they were last employed. All sought benefits for the period of the work stoppage resulting from the dispute. The *Block* case was cited and discussed by this Court in the *Miners* case, and in the opinion there is this observation: "It is interesting to note that all of the cases we have cited and discussed grew out of the identical controversy. * * *"

There is no evidence in this record showing that these petitioners were "participating" in or "financing" the labor dispute which resulted in the stoppage of work during the period in question. They were not "directly interested in such a dispute", unless it could be determined that their direct interest resulted from the possibility that if those who were on strike, seeking a better contract of employment, secured such advantages, and that thereafter, petitioners again became employed in the coal mining industry, they would benefit by such improved working conditions. We believe that interest to be too remote to disqualify the petitioners under the provisions of Code, 21A-6-4, and such remote interest is not shown by the record. In stating that the record does not show that petitioners were individually participating, financing or directly interested in the labor dispute, or belonged to a class of workers who were participating, financing or directly interested in it, we are not unmindful of the rule laid down in the *Copen* case as to the burden of proof. The

first syllabus point is as follows: "Where a stoppage of work due to a labor dispute is the basis of a claim for unemployment compensation under Section 4(4), Article 6, Chapter 76 of the Acts of the Legislature of 1943, the burden rests upon the applicant to show to the satisfaction of the Director of Unemployment Compensation that he was not participating, financing, or directly interested in such labor dispute and that he did not belong to a grade or class of workers who were."

Code, 21A-6-4(4), provides that where a claimant's unemployment is due to a stoppage of work, existing because of a labor dispute at the premises where he was last employed, the Director of Employment Security must be satisfied that such claimant was not participating, etc., or belonged to a grade or class of workers who were participating, etc., in such dispute. In these cases, the Director was satisfied by information initially secured that petitioners were not at fault in either category. In the *Copen* case, the converse was true. That case may be further distinguished from the instant cases in that the employer-employee relationship did not exist at the time the labor stoppage began. The inexorable rule of presumption of fault applies only to those individuals who were employees at the time the work stoppage began. Upon the taking of evidence upon the appeal by the employees from the deputies' decision, no proof was produced at the hearing before the Board of Review, sitting in lieu of a Trial Examiner, to the contrary as to actual participation, financing or interest in the dispute by petitioners. The petitioners admitted membership in the United Mine Workers organization, and thus the question of whether thereby they belonged to a grade or class of workers who were participating, etc., in the labor dispute became one of law not fact.

In *The Point Reyes* case, 110 F. 2d. 608, (C.A.5), the first syllabus point is as follows: "To constitute a 'strike,' there must be the relation of employer and employee, and a quitting of work." There is a recent annotation in 28 A.L.R.

2d. 287, entitled "Construction and application of provisions of unemployment compensation or social security acts regarding disqualification for benefits because of labor disputes or strikes.", and under Section 6, Page 300, there is this statement: "The question of whether an employer-employee relationship is necessary to the existence of a labor dispute has been considered in a number of cases. Although these cases are not in complete agreement, the conclusion that generally continuance of the employer-employee relation is necessary for the existence of a labor dispute, seems justified." *Miners* v. *Hix, supra,* is cited for this statement: "Generally a labor dispute can only exist between the individual workers and their employers."

A Utah case, *Olof Nelson Constr. Co.* v. *Industrial Commission,* 243 P. 2d. 951, is cited for this proposition: "In order to have a trade dispute involving the employer, or a strike involving the grade, class, or group of workers, there must exist an employment relationship."

The California court held that the refusal to cross a picket line at the plant of the employer did not terminate the employer-employee relationship, and the claimants were held to be disqualified from receiving benefits until the subsequent discharge of the claimants. *Thomas* v. *California Employment Stabilization Com.* (1952), 247 P. 2d. 561.

The Indiana case of *Blakely* v. *Review Board,* 90 N. E. 2d. 353, is cited as holding that the term "labor dispute" necessarily implies the existence of the relationship of employer and employee, and ordinarily when such relationship has been terminated the statute rendering an individual ineligible for benefits where there is a labor dispute has no application. The annotation contains several other cases representing both views upon the question.

Certainly, the employer-employee relationship had terminated as to these four petitioners long before the period of the work stoppage. The only relationship between

these petitioners and the striking employees was mutual membership in a labor organization, the United Mine Workers of America. We do not say that this alliance might not be sufficient under the decision in the *Copen* case to disqualify the petitioners if they had been employees at the time the strike began, but upon the facts in these cases, the *Copen* case may be clearly distinguished therefrom. There was no specific offer of a job by any employer in the coal mining industry for the period of February 6—March 5, and to hold that these petitioners are disqualified from benefits because a strike was in progress would mean that in any case where a member of a certain union was unemployed, and though offered no employment, would state that he would not accept employment at a plant where a strike was in progress where the striking employees were members of the same union as he, would be virtually to disqualify all members of unions who happened to be unemployed, for reasons in no way connected with a strike, while such strike was in progress at any mine or plant where employment might be available to them by an employer whose employees were members of the same trade union to which they belonged. Such a construction would result in the peremptory disqualification of all union members, whereas, under similar circumstances, an individual who was not a member of a union would not be disqualified. We do not believe that such a discrimination was intended by the Legislature when Code, 21A-6-4, was passed by that body and became the law of this State.

It may again be emphasized that the decisions of this Court in *Copen* v. *Hix, supra,* and *Miners* v. *Hix, supra,* have no application to the instant cases. The claimants in those cases had continued their employment for their employers up to the moment of the beginning of the labor stoppage, and the decisions in those cases were based upon the fact that the employer-employee relationship was maintained during the work stoppage, and both the employers and the employees expected the employment relationship to continue when the labor dispute was

settled. Here, the employer-employee relationship was severed months before the labor dispute resulted in a work stoppage.

In *Miners* v. *Hix, supra,* the Court said: "The contention that there can not be a dispute in the absence of a contract is not, in our opinion, tenable. We think the record clearly shows that the mine workers, who were undoubtedly employees of the operators when the joint conference met in New York, continued such employment up to the end of their contract on March 31st, and treated and considered themselves as employees after that date until they resumed work on May 14th. There is nothing in the record indicating that the relation of employer and employee ever terminated. The employees expected to return to work when a contract had been signed, and the operators expected to open their mines and resume operations when such agreement was reached. There was no break in the relationship between them.* * *" The following language from the opinion in the *Copen* case must be read with the knowledge that in that case there was a definite employer-employee relationship: "* * * While we do not believe that in its true sense a grade or class necessitates membership in a recognized organization, yet, conversely, the proof of membership in an organization directing, participating in, indorsing, and if necessary financing, a strike which causes a work stoppage we think certainly places a member in the same grade or class as the other members of the organization, whether it be local, state, or national. As stated, in our opinion the term 'grade or class' is coextensive with the circumstances of each particular case and is to include all who were participating, financing or directly interested in the labor dispute involved.* * *"

The only other case previously decided by this Court, that is in point or at least analogous, is *The Homer Laughlin China Co.* v. *Hix, Clerk, Etc., et al.,* 128 W. Va. 613, 37 S. E. 2d. 649. That case likewise involved the construction of Code, 21A-6-6, but Subsection (2) thereof, rather than Subsection (1), which is primarily involved in these cases. Subsection (2), as heretofore stated, provides that benefits

shall not be denied to an individual, otherwise eligible for receiving such benefits, who refuses to accept new work "if the wages, hours, or other conditions of the work offered are substantially less favorable to the individual than those prevailing for similar work in the locality." The third syllabus point in *The Homer Laughlin China Co.* case, *supra,* is as follows: "An employee who engages in a strike, conducted without the authority required by, and in violation of, a wage agreement and which results in his unemployment during a stoppage of work caused by a labor dispute at the factory at which he was last employed, but who, with other employees, during such strike, offers to return to work without any change in his former working conditions, striking employees of other employers in the same industry and in the same locality having been permitted by their employers to return to their former positions without change of working conditions, and who is not permitted to return to his work by the employer, unless he does so as a new employee, is, within the meaning of the last sentence of Subsection 4, Section 4, Article 6, Chapter 76, Acts of the Legislature, 1943, required to accept conditions of employment less favorable than those prevailing for similar work in the same locality; and such action by the employer excludes such employee from disqualification for unemployment benefits under that subsection of the statute." The Court held that the striking employees until a certain date were ineligible for benefits; that thereafter they were eligible under the provisions of Paragraph 2, inasmuch as they were willing to return to work under their former conditions of employment, but the employer refused to accept them except as new employees. Judge Haymond, who wrote the opinion for the Court, said: "But the action of the company did not end with the requirement that respondent and the other two employees be not permitted to return to work because ·of their participation in the strike. After the local, in the mistaken belief that all the striking employees of the company would be taken back without any change in

their former working conditions, had voted on August 6, 1943, that the men would return to work, and after its members who were employees of other employers had returned to regular work in the same locality, without any change in their former conditions of employment, the petitioner on August 7, 1943, refused to take back its employees, including the respondent, unless they should apply for and return to their positions as new employees. This condition, if accepted by the employees, would, of necessity, have deprived them of their rights of seniority, which are often more valuable to, and are more highly prized and cherished by, the workmen, than almost any other incident of their employment." The inference is clear that the only reason the employer was not justified in requiring the striking employees to return as "new employees" was because the employer-employee relationship had not ended, and, therefore, the employment to which the employees returned was not "new work". It is apparent that if the claimants had been formerly employed by this or another employer, engaged in the same business as the Homer Laughlin China Company, that the latter would have been justified in requiring such claimants to be accepted only as new employees. If such an individual is a "new employee" accepting "new employment" by a "new employer", we believe it obvious that the labor which he would be employed to perform is "new work".

The benign purpose of the Unemployment Compensation Law, as expressed by the Legislature in Article 1, Section 1 of the Act, must be given proper weight and consideration, and is as follows:

> "The purpose of this chapter is to provide reasonable and effective means for the promotion of social and economic security by reducing as far as practicable the hazards of unemployment. In the furtherance of this objective, the legislature established a compulsory system of unemployment reserves in order to

"(1) Provide a measure of security to the families of unemployed persons.

"(2) Guard against the menace to health, morals, and welfare arising from unemployment.

"(3) Maintain as great purchasing power as possible, with a view to sustaining the economic system during periods of economic depression.

"(4) Stimulate stability of employment as a requisite of social and economic security.

"(5) Allay and prevent the debilitating consequences of poor relief assistance."

Thus, the Act is not only remedial in its nature, but its purpose is to conserve the public good and preserve the general welfare.

Upon this question, the following quotations are from Vol. II, Lewis' Sutherland Statutory Construction, Second Edition: Sec. 582: "The law favors a liberal construction of certain statutes to give them the most beneficial operation. * * * Two classes of statutes are liberally construed —remedial statutes, and statutes which concern the public good or the general welfare." Sec. 589: "The modern doctrine is that to construe a statute liberally or according to its equity is nothing more than to give effect to it according to the intention of the lawmaker, as indicated by its terms and purposes. This construction may be carried beyond the natural import of the words when essential to answer the evident purpose of the act; so it may restrain the general words to exclude a case not within that purpose." Sec. 590: "Where the intent of the act is manifest, particular words may have an effect quite beyond their natural signification in aid of that intent."

In the 1945 Cumulative Pocket Part to Words and Phrases, Permanent Edition, Volume 13, under the phrase "Due To", this quotation from *Sun Shipbuilding & Dry Dock Co. v. Unemployment Compensation Board of Review*, (Pa.), 52 A. 2d. 362, 364, appears: "The phrase, 'due to', in statutory provision declaring employee ineligible

for compensation for unemployment due to voluntarily leaving work without good cause, is synonymous with 'caused by', 'resulting from', 'sustained by', 'sustained by means of', and 'sustained in consequence of'."

This Court holds, upon the evidence adduced and the record presented to it in these cases, that: Prior to the period in question, and for causes other than a stoppage of work which resulted from a labor dispute, petitioners became unemployed and the employer-employee relationship with their last employer was severed; during the period February 6—March 5, 1950, neither had any employment relationship with or attachment to any employer, therefore, the work which each refused to accept was "new work"; petitioners were not made ineligible for benefits, being "able to work and * * * available for full time work for which they were fitted by prior training and experience" by virtue of their refusal to accept jobs vacant because of a work stoppage due to a labor dispute at the premises where they were last employed, inasmuch as such work was not "suitable work"; and petitioners are not disqualified for benefits since their unemployment for the period in question was not due to a stoppage of work resulting from a labor dispute at the premises at which they were last employed in which they participated, financed, or were directly interested in, nor did they "belong to a grade or class of workers who were participating, financing, or directly interested in the labor dispute which resulted in the stoppage of work".

The judgment of the Circuit Court of Kanawha County and the decision of the Board of Review, West Virginia Department of Employment Security, are reversed, and the cases are remanded to the Director of Employment Security for the payment of unemployment compensation benefits to these petitioners, and all others similarly situate, for the period February 6—March 5, 1950.

*Reversed and remanded with directions.*