624 S.E.2d 769

Cindy L. ADKINS, Cynthia S. Cooper
and Billie J. Gill, Appellants,

v.

Cathy S. GATSON, Clerk of the Circuit
Court of Kanawha County; Board of
Review, West Virginia Bureau of of Em-
ployment Programs; Commission, Bu-
reau of Employment Programs; City of
Hinton, Appellees.

No. 32509.

Supreme Court of Appeals of West Virginia.

Submitted: Sept. 21, 2005.

Filed: Nov. 17, 2005.

William D. Turner, Pyles, Haviland, Turner & Smith, Lewisburg, for Appellants.

Paul L. Frampton, Jr., Atkinson, Mohler & Polak, for Appellee City of Hinton.

Darrell V. McGraw, Attorney General, Christie S. Utt, Assistant Attorney General, Charleston, for Appellee Board of Review, West Virginia Bureau of Employment Programs.

Angela J. Ball, Pullin, Fowler & Flanagan, Beckley, for Sanitary Board of the City of Hinton.

1. The Board filed a brief supporting reversal of the circuit court's order.

2. The City of Hinton filed a brief on behalf of itself and the City of Hinton Sanitary Board.

3. Ms. Cooper and Ms. Gill were employed by the City of Hinton. Ms. Adkins was employed by the City of Hinton Sanitary Board.

4. Mr. Cyphers was a retired State Trooper. The City hired Mr. Cyphers to resolve problems in the police department. Mr. Cyphers was permitted

The Opinion of the Court was delivered PER CURIAM.

Justice STARCHER dissents and reserves the right to file a dissenting opinion.

PER CURIAM.

This appeal was filed by Cindy L. Adkins, Cynthia S. Cooper and Billie J. Gill (hereinafter referred to collectively as the "Appellants") from an order of the Circuit Court of Kanawha County. The circuit court order reversed a decision of the Board of Review, West Virginia Bureau of Employment Programs (hereinafter referred to as the "Board"). The circuit court reversed the Board's decision to award unemployment compensation benefits to the Appellants.[1] The circuit court found that the Appellants were disqualified from receiving unemployment benefits because they left their employment without good cause involving fault on the part of their employer, the City of Hinton[2] and the City of Hinton Sanitary Board (hereinafter referred to collectively as the "City").[3] Here, the Appellants assign error to the circuit court's treatment of the City's appeal as a writ of certiorari, allowing new evidence to be introduced, and in the circuit court's determination that good cause for resigning was not shown. After listening to the arguments of the parties and carefully reviewing the record, we affirm the circuit court's order.

## I.

### FACTUAL AND PROCEDURAL HISTORY

On September 5, 2002, a fight broke out at City Hall between a special police officer hired by the City, Melvin Cyphers,[4] and a City Councilman, Bobby Wheeler.[5] Ms. Cooper and Ms. Gill witnessed the fight, but Ms. Adkins did not.[6] Ms. Gill unsuccessfully at-

to carry a handgun. He had a handgun on at the time of the altercation with Mr. Wheeler.

5. It is not clear as to who started the fight. However, the fight appears to have been related to conduct by Mr. Cyphers in questioning City employees, including the Appellants, concerning the whereabouts of the police chief. It appears that the police chief, who was the husband of Ms. Adkins, was out of the office visiting his terminally ill brother.

6. Although Ms. Adkins worked at City hall, she was not in the building at the time of the fight.

tempted to break up the fight.[7] Local police officers were summoned and after a brief scuffle with Mr. Cyphers, they placed him under arrest.[8]

As a result of the fight, the Appellants were told by City Council President Larry Meador to not return to work until the altercation matter was resolved. The Appellants were informed that they would be provided police protection when they returned to work. The Appellants returned to work on September 11, 2002, and police protection was provided. On October 1, 2002, the Appellants sent a jointly signed memo to the City's Mayor and Council, seeking to learn the status of Mr. Cyphers and their police protection. The memo stated, in part, the following:

The working environment at City Hall continues to be extremely uncomfortable. The City Hall staff, Billie Gill, Cindy Adkins and myself, has found ourselves [sic] in a situation where we are forced to work in a daily atmosphere of fear due to the September 5, 2002 altercation.

We have not been advised as to what is the current status of Mr. Cyphers. Is he still employed by the City of Hinton? Is he our supervisor? Will he attack again? These are just a few of the questions we have. Yet, no one, not the Mayor or members of Council has taken the time to discuss this situation with us, with the exception of Councilor Wheeler. We are just wondering what will happen next.

This situation is not only detrimental to our well-being, but it is not conducive to a work environment. Are we going to remain under police protection? We feel that the situation has gone beyond reason for any person to have to endure.

. . . .

As employees of the City of Hinton and as tax paying citizens, we feel we have the right to work under a nonviolent work atmosphere; without fear of being harassed or attacked.

The Appellants received no direct response to their memo. Instead, on October 2, 2002, the City's Mayor sent a memo to the police chief stating:

I am asking to remove the police officers from their City Hall duty as of today. *Mr. Cyphers* was injured on September 5 and will not return for at least three months. He has not been at City Hall for more than two weeks. Continuing with extra police duty at City Hall is not necessary.

Subsequent to the Mayor's memo, Ms. Gill and Ms. Cooper resigned on October 8, 2002; Ms. Adkins resigned on October 9, 2002.

Each Appellant filed for unemployment compensation after resigning. In a signed statement, given for unemployment benefits, Ms. Gill gave the following reasons for resigning:

I quit my job on 10–8–02, because of harassment. The Mayor took office in 7–2001 and since then it has been a constant battle to work, she has hired a consultant to straighten out problems in [the] Department and he attacked a person in the office after he was there one hour. We have had police security there and she has changed job duties that we have not been trained for, then she is upset and puts false information in the newspapers.

In a signed statement, given for unemployment benefits, Ms. Cooper gave the following reasons for resigning:

I quit my job on 10/08/02, due to violence at the work place and the constant harassment by the Mayor of Hinton. On 09/05/02, an altercation took place at work where a City Councilman was attacked. The attack was by an individual that the Mayor had appointed. This individual was arrested for two counts of battery against two police officers and one count of battery against the Councilman. After this incident, President of the Council, Larry Meador assigned a policeman to guard the employees 8 hours a day. On 10/02/02 the Mayor removed this policeman stating that the individual who had [the] altercation

---

7. Ms. Gill grabbed Mr. Cyphers in an effort to stop the fight. Mr. Cyphers yelled an obscenity at her and told her that she was under arrest.

8. At the time of the proceedings before the administrative law judge, criminal charges were pending against Mr. Cyphers for his role in the fight. The charges appear to have eventually been dropped.

had not been in the City Hall for more than two weeks and would not return for at least 3 months. The City employees had been told by the Councilman Jordan that this individual would not return to the City Hall, however, the Mayor stated he would in 3 months. Prior to the altercation the Mayor would harass the City employees by accusing us of doing things that were not true.

In a signed statement, given for unemployment benefits, Ms. Adkins gave the following reasons for resigning:

I quit my job on October 9, 2002, because of violence and harassment in the workplace. The Mayor of Hinton hired a male individual on September 5, 2002. This person initially was called the administrator. Subsequently his title changed 3 more times. He was called a special police officer at last. On his first date of employment within 2 hours he was involved in a physical altercation with a Council member. This incident required the police to be called. This altercation occurred in the same location of my office. He was arrested for the offense and placed in handcuffs. He was later removed from the building and taken to the hospital.

He returned to work the following day, however I did not because I knew he was coming to work. The City employees were told by the Council not to return to work until the matter was resolved. I returned to work on the following Wednesday and he was there also. He stayed about 4 hours and returned the following day for the same. We were instructed by the Council to have a uniformed police office[r] at the office for the entire shift while we were working. The police was there even if the man was not. The officer escorted us in and out of the building, to other rooms etc. We feared for our safety. The officer was there approximately a month until the Mayor said we could no longer have him there with us.

There were discrepancies in what the Mayor was saying. She told Council that he would not be back but she told the police

department that he would not be back for 3 months.

This person was very intimidating. There was an occasion he entered my office and told me that I had to tell him where my husband was. (My husband i[s] the chief of police). When I informed him he was on vacation and had serious family matters to take care of, he pointed his finger and said he would be back to talk to me.

The claims for unemployment compensation were initially heard by a Deputy Commissioner for the Board. In three separate orders the Deputy Commissioner found that each Appellant "was subjected to violence and harassment in the workplace and the employer failed to correct the situation." Consequently, the Deputy Commissioner held that for each Appellant "no disqualification can be imposed."

The City appealed the Deputy Commissioner's decisions. All three appeals were consolidated for hearing before an administrative law judge. At the conclusion of the hearing, the administrative law judge issued three separate orders affirming the decisions of the Deputy Commissioner. The City appealed the decisions of the administrative law judge to the Board. In three separate orders, the Board adopted the findings of the administrative law judge and affirmed each decision.[9] The City appealed the Board's orders to the circuit court. The circuit court, by order entered April 27, 2004, reversed the orders of the Board and found the Appellants were disqualified from receiving unemployment compensation benefits. The Appellants thereafter jointly appealed to this Court.

## II.

### STANDARD OF REVIEW

This Court set out the applicable standard of review syllabus point 3 of *Adkins v. Gatson,* 192 W.Va. 561, 453 S.E.2d 395 (1994), as follows:

The findings of fact of the Board of Review of the [West Virginia Bureau of Employment Programs] are entitled to substantial deference unless a reviewing

---

9. Insofar as the Board adopted the findings of the administrative law judge, we will refer to

them as the Board's findings.

court believes the findings are clearly wrong. If the question on review is one purely of law, no deference is given and the standard of judicial review by the court is *de novo*.

Our review of this matter is also guided by our consistent recognition that "[u]nemployment compensation statutes, being remedial in nature, should be liberally construed to achieve the benign purposes intended to the full extent thereof." Syl. pt. 6, *Davis v. Hix*, 140 W.Va. 398, 84 S.E.2d 404 (1954). Moreover, "the burden of persuasion is upon the former employer to demonstrate by the preponderance of the evidence that the claimant's conduct falls within a disqualifying provision of the unemployment compensation statute." *Peery v. Rutledge*, 177 W.Va. 548, 552, 355 S.E.2d 41, 45 (1987). Mindful of these applicable standards, we will now consider the arguments of the parties.

## III.

## DISCUSSION

### A. Treating the City's Appeal as a Writ of Certiorari and Allowing New Evidence

The circuit court's order treated the City's appeal as a writ of certiorari. Therefore, the circuit court conducted an independent review of both the law and the facts as found by the Board. In so doing, the circuit court considered three affidavits that were not submitted to the administrative tribunals.[10]

This Court has recognized that "[o]n certiorari the circuit court is required to make an independent review of both law and fact in order to render judgment as law and justice may require." Syl. pt. 3, *Harrison v. Ginsberg*, 169 W.Va. 162, 286 S.E.2d 276 (1982). We have also indicated that "[u]pon the hearing of [a] writ of certiorari, the circuit court is authorized to take . evidence, independent of that contained in the record of the lower tribunal[.]" Syl. pt. 4, in part, *North v. West Virginia Bd. of Regents*, 160 W.Va. 248, 233 S.E.2d 411 (1977). However, it has been correctly noted that "[t]he writ of certiorari may only be used when no mechanism for review of a judicial or quasi-judicial proceeding is provided for by law." *Scott v. Stewart*, 211 W.Va. 1, 6, 560 S.E.2d 260, 265 (2001) (Davis, J., dissenting). Consequently, the circuit court could treat the appeal as a writ of certiorari only if no other source of law provided for an appeal.

█ A mechanism for appealing the Board's decision is provided by law. Pursuant to W. Va.Code § 21A-7-17 (1967) (Repl.Vol. 2002), a decision of the Board is deemed final unless a "party appeals to the circuit court of Kanawha county within thirty days after mailing of notification of the board's decision." *See also Kisamore v. Rutledge*, 166 W.Va. 675, 678, 276 S.E.2d 821, 823 (1981) ("Pursuant to W. Va.Code, 21A-7-17, all unemployment compensation appeals from the Board of Review must be made to the Circuit Court of Kanawha County."). Insofar as W. Va.Code § 21A-7-17 is the vehicle for appealing a decision of the Board to the circuit court, it was error for the court to treat the appeal as a writ of certiorari.[11]

---

**10.** The affidavits were submitted by Mr. Cyphers, the Mayor and a Councilman.

**11.** The circuit court applied the wrong standard of review to the Board's findings of fact. The circuit court conducted a *de novo* review of the facts. The standard of review of findings of fact by the Board is found in W. Va.Code § 21A-7-21 (1943) (Repl.Vol.2002). That statute states that "[i]n a judicial proceeding to review a decision of the board [in an unemployment compensation case], the findings of fact of the board shall have like weight to that accorded to the findings of fact of a trial chancellor or a judge in equity procedure." This Court addressed the statutory standard of review in syllabus point 2 of *Copen v. Hix*, 130 W.Va. 343, 43 S.E.2d 382 (1947), as follows:

Under [W. Va.Code § 21A-7-21], the findings of fact by the Board of Review ... on

appeal are entitled to the same weight as those of a trial chancellor and therefore are to be set aside only when plainly wrong.

*See also Belt v. Rutledge*, 175 W.Va. 28, 30, 330 S.E.2d 837, 839 (1985) ("The circuit court's authority to review a decision of the Board of Review was stated in Syllabus point 1 of *Kisamore v. Rutledge*, 166 W.Va. 675, 276 S.E.2d 821 (1981): 'Findings of fact by the Board of Review ..., in an unemployment compensation case, should not be set aside unless such findings are plainly wrong; however, the plainly wrong doctrine does not apply to conclusions of law by the Board of Review.' ").

Under the "plainly wrong" standard of review the circuit court was not permitted to conduct a *de novo* review of the findings of fact. However, because of our disposition of this case, we do not find this issue to be reversible error.

■ In addition to improperly characterizing the appeal as a writ of certiorari, the circuit court considered three affidavits that were not presented to the lower tribunals. The Appellants contend that this was error. We agree.

■ The circuit court was sitting as an appellate court in it's review of the City's appeal. In the case of *Maxwell v. Maxwell*, 67 W.Va. 119, 67 S.E. 379 (1910), this Court addressed the issue of an appellate court's authority to review evidence not submitted to a lower tribunal:

> [W]hat is appellate jurisdiction? Does it include the power to do other than to review upon the record made below? Does it not relate wholly to the consideration of that which has been acted upon by the court from whence comes the appeal? May [an appellate] court do an original thing, act upon something that has never been heard in the court below, and call that the exercise of appellate jurisdiction? We do not think so. It is not in reason so to hold. . . .
>
> . . . [An appellate] court cannot hear evidence other than that brought up for review, except in the exercise of original jurisdiction. . . . [This] means that [an appellate court] shall deal only with evidence taken below and brought up for the purpose of a review of an order or decree made upon it below. It means that in using our appellate powers we shall consider no other evidence[.]

*Maxwell*, 67 W.Va. at 122–123, 67 S.E. at 380–381. "Accordingly, it is the parties' duty to make sure that evidence relevant to a judicial determination be placed in the record before the lower [tribunal] so that [it] may properly [be] consider[ed] . . . on appeal." *West Virginia Dep't. of Health and Human Res. ex rel. Wright v. Doris S.*, 197 W.Va. 489, 494 n. 6, 475 S.E.2d 865, 870 n. 6 (1996). *See also Pearson v. Pearson*, 200 W.Va. 139, 145 n. 4, 488 S.E.2d 414, 420 n. 4 (1997) ("This Court will not consider evidence which was not in the record before the circuit court."); *Powderidge Unit Owners Assoc. v. Highland Props., Ltd.*, 196 W.Va. 692, 700, 474 S.E.2d 872, 880 (1996) ( "[T]his Court for

obvious reasons, will not consider evidence or arguments that were not presented to the circuit court for its consideration[.]"). *But see Hall v. Rutledge*, 174 W.Va. 816, 819, 329 S.E.2d 890, 892 (1985) ("The Board has the authority under its own rules and regulations to consider additional evidence not presented to the administrative law judge[.]").

■ Although we found the circuit court committed error in treating the City's appeal as a writ of certiorari and considering additional evidence, we do not find that these errors warrant reversal. We have long held that "[t]his Court may, on appeal, affirm the judgment of the lower court when it appears that such judgment is correct on any legal ground disclosed by the record, regardless of the ground, reason or theory assigned by the lower court as the basis for its judgment." Syl. pt. 3, *Barnett v. Wolfolk*, 149 W.Va. 246, 140 S.E.2d 466 (1965). As we will show below, the circuit court's decision should be affirmed for reasons different than those upon which it relied.

### B. The Appellants Are Disqualified from Receiving Unemployment Compensation Benefits

Pursuant to W. Va.Code § 21A–6–3(1) (1990) (Repl.Vol.2002), an individual is disqualified from receiving unemployment compensation benefits if "he or she left his or her most recent work voluntarily without good cause involving fault on the part of the employer[.]" [12] The Appellants contend that they voluntarily resigned from their employment for good cause involving fault on the part of the City. The Board concluded that the City failed to take adequate steps to reassure the Appellants that a safe working environment would be maintained. Further, the Board found that such failure constituted a showing of good cause to resign that involved fault on the part of the City. Specifically, the Board reached the following conclusion as to each Appellant:

> Mayor Mathews apparently was unaware of Mr. Cyphers' reputation of violence, and she is not directly responsible for his outrageous conduct. Nevertheless, the Mayor

---

12. W. Va.Code § 21A–6–3 was amended by the West Virginia Legislature in 2005. The language herein quoted was not changed in those amendments.

did nothing to rectify the situation or address the [Appellants'] legitimate safety concerns. To the contrary, she deliberately avoided the issue. She did not attend the emergency meeting scheduled for September 9 and 10th, and would not discuss the matter.

In the memo of October 1, 2002, the [Appellants] explained their fear and apprehension. They specifically requested information regarding Mr. Cyphers' status, and wondered if he would return to work again. The [Appellants] expressed [their] concern that [they] believed the situation had gone beyond reason for any person to have to endure.

The Mayor testified that she did not discuss this situation, and she believed the office staff were working with a group that wanted her impeached from office. However, the employer should have taken steps to reassure the workers that a safe working environment would be maintained. Failure to adequately address these concerns would constitute fault on the part of the employer which caused the [Appellants] to quit [their] job.

In support of the Board's decision, Appellants contend "that workplace violence fears may form a legitimate basis for resigning one's employment[.]" The Appellants attempt to support this proposition by citing several cases from other jurisdictions. However, the cases relied upon by the Appellants are not dispositive. They address the issue of violence, attempted violence or threats *against the employee who resigned,* not others. See *Condo v. Board of Review, Dep't of Labor and Indus.,* 158 N.J.Super. 172, 385 A.2d 920, 922 (1978) ("The record establishes and the Appeals Examiner found that claimant complained to the manager of the threats of violence made by his coworker. The manager held a meeting with the employees to straighten out the problem and told the coworker that 'he was not allowed to threaten anybody or hurt anybody.' Notwithstanding this, claimant testified that he was threatened by the coworker as they left the meet-

ing. Again, he was threatened the night that he left work. Under the circumstances, claimant was clearly justified in leaving work."); *Taylor v. Board of Review,* 20 Ohio App.3d 297, 485 N.E.2d 827, 829 (1984) ("The record clearly shows that Elias previously beat appellant, and that Elias subsequently threatened [appellant] with another physical confrontation. While the employer assured [appellant] that Elias would not bother him, [appellant] was also told that the employer could do nothing about Elias.... The evidence clearly shows that appellant had reason to fear that Elias would harm him."); *Coleman v. Employment Sec. Dep't,* 25 Wash.App. 405, 607 P.2d 1231, 1232 (1980) ("Among the reasons that the appellant gave for quitting her job was a serious physical threat made against her by a male coworker.... [T]he man became upset over a fancied grievance, stormed into the room where ... the appellant ... was ... and said, 'you know what I'd like to do, I'd like to punch your cheek right down your throat.' ... The appellant testified: 'I just sat there with my mouth shut. I didn't move. He was too close to me. I was afraid. He's a strong man and I didn't feel like losing my front teeth. And he wasn't in any state where you could have talked him down either. He was in a blind rage.' "); *Hat Six Homes, Inc. v. State Dep't of Employment, Unemployment Ins. Comm'n,* 6 P.3d 1287, 1294 (Wy.2000) ("The evidence demonstrated that the president consistently touched Welch with his hands in an inappropriate manner for a person in a position of power. The record also encompasses episodes of the vice-president throwing staplers, cellular phones, and drive way alarms about the office requiring Welch to duck to avoid being struck.").[13]

■ The Board's findings of fact fail to show that any of the Appellants were physically assaulted or threatened by Mr. Cyphers. Although there was testimony that Ms. Gill placed her hands on Mr. Cyphers when attempting to breakup the fight with the Councilman, there was no evidence that Mr. Cyphers assaulted or attempted to as-

---

**13.** The Appellants also cited to two other cases that are distinguishable. See *Stark v. Ross,* 66 A.D.2d 942, 411 N.Y.S.2d 433, 435 (1978) (remanding the case to the administrative board to determine whether an unsafe working condition

existed); *In re Gardiner,* 272 A.D.2d 709, 707 N.Y.S.2d 533, 534 (2000) (claimant's fear for her life as a result of a conflict she had with coworker did not establish good cause for voluntarily leaving her employment).

sault her or threatened her safety with physical violence. Further, Ms. Cooper merely observed the fight from a distance while Ms. Adkins was not even present in the building.[14] There was no evidence that Mr. Cyphers physically assaulted or threatened the Appellants during the few times that he returned to City Hall after his fight with Mr. Wheeler.

The Board found that the evidence revealed that, with regard to Mr. Cyphers' violent outburst, the City "did nothing to rectify the situation or address the [Appellants'] legitimate safety concerns." The evidence presented at the hearing does not support such a finding.

After Mr. Cyphers was removed by police officers, the City permitted the Appellants to remain at home for three days until safety concerns could be addressed. The City ultimately decided to have a police officer remain at City Hall to protect the Appellants and others from any potential harm by Mr. Cyphers. The police officer remained at City Hall for approximately one month. Moreover, a subsequent memo by the Mayor clearly stated that the police officer was going to be removed because Mr. Cyphers would not be returning to work for at least three months.[15]

In view of the foregoing, we believe the record adequately demonstrated that the City took reasonable measures to assure the Appellants' safety in light of Mr. Cyphers' behavior. Consequently, the Appellants' decision to resign was without good cause involving fault on the part of the City.

### IV.

### CONCLUSION

The circuit court's order is affirmed.

Affirmed.

**STARCHER, J., dissenting.**

I dissent to this Court's majority opinion and decision in the instant case. I would uphold the decision of the Board of Review.

I would uphold the Board because it has a particular experience and expertise in this area. It can better weigh the equities and consider them in light of rulings in similar cases. The Board is entitled to deference, and the majority opinion simply does not give that deference.

Also, I think these employees clearly left work for reasons involving fault by their employer. The City hired someone who showed appallingly bad judgment and acted out in a dangerous manner at work. The City was responsible for his hiring and his conduct.

Did the employees who quit have a good reason for continued "fear" on the job? Maybe not—but who cares? Their terrifying experience was enough to sour them on the job, so they quit. And their terrifying experience was clearly the City's fault.

If we allow an employee to quit a job because his or her hours are cut back, and then to apply for and receive unemployment—and we do—then we must allow the same right to an employee who quits because he or she is subjected to terror at work.

Accordingly, I dissent.

---

14. There was also evidence by Ms. Adkins that when she was a teenager, 17 or 18, she met Mr. Cyphers while working at a Pizza Hut and that he "sexually harassed her." To the extent that this assertion may be true, there was no evidence that Mr. Cyphers "sexually harassed" Ms. Adkins when he was employed by the City.

15. In fact, the Board found that the "at least three months" language contained in the Mayor's memo was slightly inaccurate. Specifically, the Board found:

The [Appellants] interpreted this memo to indicate that Mr. Cyphers would eventually return to work. However, the Mayor was trying to convey the message that Cyphers, a temporary employee, would not be able to return to work within his 3–month assignment. The [Appellants were] not aware that Mr. Cyphers was hired as a temporary employee.

In other words, the evidence revealed that the City did not remove the police officer from City Hall until it was learned that Mr. Cyphers was no longer returning to City Hall.