686 S.E.2d 609

**STATE ex rel. Alex FARMER, Petitioner Below, Appellant**

v.

**Thomas McBRIDE, Warden, Respondent Below, Appellee.**

No. 34157.

Supreme Court of Appeals of West Virginia.

Submitted Sept. 23, 2009.

Decided Nov. 2, 2009.

---

See also 219 W.Va. 408, 633 S.E.2d 762.

472

Kevin D. Mills, Esq., Mills & Wagner, PLLC, Martinsburg, WV, Attorney for Appellant.

Christopher C. Quasebarth, Esq., Chief Deputy Prosecuting Attorney, Office of the Prosecuting Attorney, Martinsburg, WV, Attorney for Appellee.

PER CURIAM:

This case is before this Court upon appeal of a final order of the Circuit Court of Jefferson County entered on August 15, 2007. In that order, the circuit court denied a petition for a writ of habeas corpus filed by the appellant and petitioner below, Alex Farmer, against the appellee and respondent below, Thomas McBride, Warden. On August 3, 1990, the appellant was found guilty of first degree murder, two counts of first degree sexual assault, and one count of burglary. He was sentenced to life in prison with mercy for the first degree murder conviction, fifteen to twenty-five years for each sexual assault conviction, and one to fifteen years for the burglary conviction. The circuit court ordered that the sentences be served consecutively.

In this appeal, the appellant first contends that the circuit court erred by denying his motion to amend his habeas petition to add a *Zain III* claim.[1] The appellant also argues

---

1. In 1993, this Court appointed a special judge to conduct an investigation into allegations that State Trooper Fred Zain, a serologist in the West Virginia State Police Crime Laboratory, had given false testimony in criminal prosecutions. The investigation revealed that Trooper Zain had, in fact, intentionally and systematically given inaccurate, invalid, and false testimony and reports. Accordingly, in *In the Matter of the West Virginia State Police Crime Laboratory, Serology Division ("Zain I")*, 190 W.Va. 321, 340, 438 S.E.2d 501, 520 (1993), this Court adopted the finding of the special judge that

> as a matter of law, any testimonial or documentary evidence offered by Zain at any time in any criminal prosecution should be deemed invalid, unreliable, and inadmissible in determining whether to award a new trial in any subsequent habeas corpus proceeding. The only issue in any habeas corpus proceeding would be whether the evidence presented at or

prior to trial or prior to the entry of a guilty plea, independent of the forensic evidence presented by Zain, would have been sufficient to support the verdict or plea.

Subsequently, this Court was confronted with the question of whether serologists employed by the State Police Crime Lab, other than Trooper Zain, had also falsified evidence in criminal prosecutions. This Court ordered another investigation in 1994, and upon a finding of some occasional but relatively minor errors which did not significantly compromise the criminal prosecutions in which the evidence was offered, the matter was closed. *See In the Matter of the West Virginia State Police Crime Laboratory, Serology Division ("Zain II")*, 191 W.Va. 224, 445 S.E.2d 165 (1994). In 1999, more allegations arose involving another serologist other than Trooper Zain resulting in yet another investigation and this Court's decision in *In the Matter of: Renewed Investigation of the State Police Crime Laboratory, Serology Division ("Zain III")*, 219 W.Va. 408,

that the circuit court erred in denying him habeas relief. This Court has before it the petition for appeal, the entire record, and the briefs and argument of counsel. For the reasons set forth below, the final order is affirmed.

## I.

### FACTS

On the morning of April 15, 1988, Marjorie Bouldin, an elderly woman who lived alone, was found dead in her home in Jefferson County, West Virginia. There was evidence of a burglary, and Ms. Bouldin had been sexually assaulted. The cause of death was determined to be asphyxia from manual strangulation. The appellant, who had been hired to paint the exterior of Ms. Bouldin's home the day before her body was discovered, was identified as a suspect.

Subsequently, on September 1, 1989, the appellant was indicted on two counts of first degree sexual assault, one count of burglary, and one count of first degree murder. At a pre-trial suppression hearing on January 26, 1990, State Police Corporal J.A. Jeffries testified that as part of the murder investigation, he and Jefferson County Sheriff's Deputy Robert Shirley spoke with the appellant on April 16, 1988. The appellant was not under arrest at that time, and he signed a *Miranda*[2] waiver form. The appellant gave a statement, but then requested an attorney and ended the interview. On that same day, the appellant and his brother gave consent for the police to search their home. The appellant identified the clothing that he was wearing on April 14, 1988. The police seized the clothing which included a blue t-shirt and jeans. Corporal Jeffries also testified at the suppression hearing, that he and Deputy Shirley interviewed the appellant on June 8, 1989, at New Jersey's Bayside Prison where the appellant was incarcerated on unrelated charges. The appellant again signed a *Miranda* waiver form and gave another statement. The court ruled that the statements were given voluntarily and that the clothing

had also been seized by voluntary consent. Therefore, the statements and clothing were deemed admissible at trial.

The appellant's trial began on July 24, 1990. Prior to the start of trial, the single alternate juror replaced a member of the jury who had become ill and was hospitalized. The appellant requested the selection of another alternate. The State opposed recalling the jury panel, and the trial court would not select a new alternate without agreement of the parties. During lunch on the first day of trial, another member of the jury, Cheryl Cook, informed the court that she had learned that the bank where she worked was administering Ms. Bouldin's estate. The appellant moved to disqualify Ms. Cook, but the court denied the motion. Ms. Cook stated that knowing her employer was administering Ms. Bouldin's estate would not affect her ability to fairly and impartially hear the case and that she felt comfortable continuing as a member of the jury.

In addition to the statements the appellant gave to the police, the State presented the following evidence at the appellant's trial. First, Eva Longerbeam testified that she spoke with Ms. Bouldin on the phone on April 14, 1988, between 7:30 p.m. and 8:00 p.m. Mary Woodward then testified that she found Ms. Bouldin's body around 9:40 a.m. the next morning. A window in the home had been broken and footprints were found in the basement. The county coroner, Dr. William Miller, testified that the time of death was six to twelve hours before the body was found. Dr. James Frost, the State Medical Examiner, testified that the time of death was eight to twelve hours before the body was found, plus or minus four hours. He also testified that some of the abrasions found on the body could have been caused by coarse work gloves.

Marshall Lynn Fitzwater testified that he worked with the appellant for about six months painting and clearing brush. He and the appellant, along with Kevin DeHaven, painted Ms. Bouldin's home on April 14,

633 S.E.2d 762 (2006), which is the basis for the appellant's argument.

2. *See Miranda v. Arizona*, 384 U.S. 436, 444–45, 86 S.Ct. 1602, 1612, 16 L.Ed.2d 694, 706–707 (1966).

1988. On that day, the appellant was wearing a blue t-shirt, blue jeans, and new tennis shoes. Mr. Fitzwater stated that none of the painters went into Ms. Bouldin's basement. He also testified that the appellant did not have any scars or marks on his face that day. He dropped the appellant off "by the river" on the evening of April 14, 1988, around 8:05 p.m. to 8:10 p.m. The appellant told him that he was going to the home of Charles Grim. Mr. Fitzwater testified that the next day, the appellant was wearing the same clothes, and he had a scratch on his nose. The appellant told him that he was scratched by Mr. Grim's dog.

Mr. Charles Grim testified that he lived near Ms. Bouldin. He stated that the appellant came to his house between 8:00 p.m. and 8:30 p.m. on April 14, 1988. He knew the appellant but was not expecting him. The appellant had not been to Mr. Grim's house before. The appellant told him that Lynn Fitzwater had dropped him off. He did not notice any scratches on the appellant's face and stated that his dog never scratched the appellant. Mr. Grim testified that the appellant left between 9:00 p.m. and 9:30 p.m. that evening but returned between 11:00 p.m. and 11:30 p.m. The appellant spent the night on Mr. Grim's couch, and Mr. Grim dropped him off at a convenience store at 5:00 a.m. the next morning.

Hilda Grim, wife of Charles Grim, testified about the appellant coming to her house on the evening of April 14, 1988. She stated that the appellant left between 9:00 p.m. and 9:30 p.m. indicating that he was going to Sonny Pumphrey's house and then home. She said that the appellant returned though around 11:00 p.m. to 11:30 p.m. He was wearing sneakers.

Deputy Shirley testified about the appellant's appearance and demeanor when he gave his statement to the police on April 16, 1988. He said that the appellant had scratches on his face, seemed nervous, and attempted to avoid providing the blue t-shirt. He also stated that the appellant's hands were red and swollen. Deputy Shirley further testified that the distance between the homes of Ms. Bouldin and Mr. Grim was a ten-minute walk. Deputy Shirley also identified photographs of footprints on Mr. Fitzwater's truck which allegedly belonged to the appellant.[3] He stated that the footprints were the same size as footprints found in Ms. Bouldin's basement.

State Trooper Ted Smith, a serologist in the State Police Crime Lab, testified that the appellant's clothing and other items from the crime scene had been sent to the Crime Lab for examination and testing on April 20, 1988. The Crime Lab later received a blood sample from the appellant for comparison purposes. Trooper Smith testified that seminal fluid was found on the appellant's t-shirt and jeans and that the genetic markers in the seminal fluid were consistent with the appellant's genetic markers. He also testified that no blood was found on the appellant's clothes, that all of the blood found in the victim's home was consistent with the victim's genetic markers, and that no semen was found on the swabs taken from the victim. State Police Sergeant Mark Neal, an expert in fingerprint testing, testified that the fingerprints at the scene did not belong to the appellant. State Police Trooper Barrick, an expert in forensic chemistry, testified that no carpet fibers from the victim's home were found on the appellant's blue t-shirt or jeans.

The appellant's cousin and Mr. Pumphrey's daughter, Joyce Sutphin, and her husband, Gary Sutphin, testified that they were at Mr. Pumphrey's home all night on April 14, 1988, and never saw the appellant.[4] Frank Ramsburg, Velma Penwell, and Terry Valencia testified that they observed a man walking down the road near Ms. Bouldin's home between 9:00 p.m. and 9:30 p.m. on April 14, 1988. Mr. Ramsburg testified that the man was the appellant and he said hello to him. Velma Penwell said that the man appeared to be wearing gloves.

David Tomlin testified that the appellant told him that he had broken into Ms. Boul-

---

**3.** Mr. Fitzwater testified that the appellant's footprints were on the hood of his truck because he would step on the hood of the truck to tamp brush down in the back.

**4.** Mr. Pumphrey died before the appellant's trial.

din's home, but that he did not kill her. James Lang, the appellant's brother-in-law, testified that he overheard the appellant tell someone that he broke into Ms. Bouldin's house but that he did not murder her.

The defense presented the testimony of Ethel Long who testified that she saw a green truck with racks on it at the victim's house on April 15, 1988, at around 6:45 a.m. She testified that it was the same truck she had observed there the day before. During rebuttal, the State called Donna Fitzwater, wife of Lynn Fitzwater, who testified that her husband had a green pick-up truck. She said that her husband was home on April 14, 1988, from 3:30 p.m. to 8:00 p.m., when he left with the appellant. He returned at 9:20 p.m. alone. She further testified that the appellant returned to their home around 5:00 a.m. the next morning. When she left the house at 7:30 a.m. that morning, her husband's truck was outside their house, the appellant was on her couch, and her husband was in bed. She also testified that the appellant had scratches on his face. She said that her husband's truck always needed to be jumped to start and that he did not leave the house during the night of April 14 through the morning of April 15, 1988. The State also recalled Deputy Shirley who testified that Ethel Long told him during the investigation that she never saw the truck in Ms. Bouldin's driveway before April 15, 1988.

During their deliberations, the jury requested the use of a magnifying glass. The appellant objected, but the court permitted the jury to use a magnifying glass. Thereafter, the jury returned guilty verdicts on all charges. The appellant was sentenced to life in prison with mercy for first degree murder, fifteen to twenty five years in prison for each of two counts of first degree sexual assault, and one to fifteen years in prison for one count of burglary. The court ordered that the sentences be served consecutively.

Thereafter, the appellant filed an appeal with this Court which was refused by order entered on January 29, 1992. The appellant then filed a petition for a writ of habeas corpus pursuant to this Court's decision in Zain I.[5] The circuit court denied the habeas

petition by order entered on January 30, 1996. The appellant then filed an appeal of that order with this Court which was refused on August 23, 1996. On April 4, 2005, the appellant filed the petition for a writ of habeas corpus which is the subject of this appeal. The petition was filed pro se but the appellant was later appointed counsel. The appellant's appointed counsel advised the circuit court that the appellant was relying on his pro se petition and that an amended petition would not be filed. However, following this Court's decision in Zain III which was issued on June 16, 2006, the appellant filed a motion to amend seeking to add a Zain III claim to his petition for writ of habeas corpus. The respondent opposed the motion, and the motion was subsequently denied by the circuit court because the appellant's case was one of the ten cases specifically reviewed during the Zain III investigation. Thereafter, the appellant's petition for a writ of habeas corpus was denied by an order entered on August 15, 2007. This appeal followed.

## II.

### STANDARD OF REVIEW

The appellant's first assignment of error concerns the circuit court's denial of his motion to amend his habeas petition. This Court has held:

A trial court is vested with a sound discretion in granting or refusing leave to amend pleadings in civil actions. Leave to amend should be freely given when justice so requires, but the action of a trial court in refusing to grant leave to amend a pleading will not be regarded as reversible error in the absence of a showing of an abuse of the trial court's discretion in ruling upon a motion for leave to amend.

Syllabus Point 6, *Perdue v. S.J. Groves and Sons Co.*, 152 W.Va. 222, 161 S.E.2d 250 (1968). The appellant's second assignment of error concerns the circuit court's denial of habeas relief. In Syllabus Point 1 of *Mathena v. Haines*, 219 W.Va. 417, 633 S.E.2d 771 (2006), this Court held:

---

5.  *See* note 1, *supra*.

In reviewing challenges to the findings and conclusions of the circuit court in a habeas corpus action, we apply a three-prong standard of review. We review the final order and the ultimate disposition under an abuse of discretion standard; the underlying factual findings under a clearly erroneous standard; and questions of law are subject to a *de novo* review.

With these standards in mind, the issues presented will be considered.

## III.

## DISCUSSION

As set forth above, the appellant contends that the circuit court abused its discretion in denying his motion to amend his habeas petition and further, abused its discretion by denying him habeas relief based upon errors that occurred during his trial. The appellant's arguments will be addressed below, separately.

### A. Denial of Motion to Amend

■ The appellant first contends that the circuit court erred by refusing to allow him to amend his petition for a writ of habeas corpus to assert a *Zain III* claim. In order to fully address this issue, some additional factual background is needed. As noted above, the police seized the clothing that the appellant was wearing on April 14, 1988. The clothes, along with various items from the crime scene, including clippings of the victim's fingernails, the victim's bedding, a rug, and the victim's clothing, were sent to the West Virginia State Police Crime Lab on April 20, 1988, for testing. At the appellant's trial, Trooper Ted Smith testified that he had personally participated in the testing of this evidence. On cross-examination, Trooper Smith acknowledged that Trooper Zain was the primary analyst on the initial submission and testing of the evidence, but as the secondary analyst, his job was to witness the results of the testing and confirm the testing that was done by the primary analyst. Trooper Smith explained that Trooper Zain

had left his employment with the State Crime Lab for a job in Texas. Trooper Smith further testified that the appellant's blood sample was submitted for comparison testing after Trooper Zain had left the Crime Lab.[6] Trooper Smith then performed the testing which revealed that appellant's genetic markers were consistent with the genetic markers in the seminal fluid found on the appellant's t-shirt and jeans. Trooper Smith also performed testing to determine whether the appellant's genetic markers were consistent with anything found in the victim's residence. His testing revealed no genetic markers on those items consistent with the appellant's genetic markers. In other words, there was no forensic evidence connecting the appellant to the crime scene. Mr. Farmer's genetic markers were only consistent with those found in the seminal fluid on his own clothing.

Following his conviction, the appellant filed a petition for a writ of habeas corpus on January 3, 1994, asserting that Trooper Zain had participated in his case and seeking relief pursuant to this Court's decision in *Zain I*.[7] An evidentiary hearing was held on November 7, 1994, at which time Trooper Smith testified that Trooper Zain was the principal analyst when the evidence at issue was received by the Crime Lab. He explained that Trooper Zain "processed the items and selected the stains that were to be tested—all those preliminary things that are done." Trooper Smith stated, however, that he had observed and participated in the serological testing of the items. The following exchange occurred between the prosecutor and Trooper Smith at the November 7, 1994, hearing:

Q: The next sentence [in the preliminary report] says, "Stains of human blood were identified on the oral swabs, slides, sheets, nightgown, blue shawl, fingernail clippings, pink blanket, pillow case and rug."

Did you participate in testing that identified the existence of blood on those items?

---

6. Trooper Zain left his employment with the State Police Crime Lab in July 1989. The appellant's blood sample was submitted to the State Police Crime Lab for testing on February 5, 1990.

7. *See* note 1, *supra.*

A: I reviewed the work that was done on those items and saw the tests performed. I didn't set them up myself, but I reviewed the work on them.

Q: It says, "No blood identified on remaining items." Did you participate in the testing, if any was done, the result of which was an absence of the finding of blood on other items?

A: No, sir. All that falls under the Preliminary Category. The negative results would have been when the evidence was processed, meaning no stains were identified that warranted further testing.

I came into play when it became time for genetic markers to be identified on items, meaning enzyme testing, ABO testing, that sort of thing, all except on the jeans, and I remember those specifically because when I labeled them, I mismarked one of the items.

In my discussions with Fred [Zain], I advised him that the jeans and the panties were positive and he said, "No, it wasn't the panties, it was the shirt," and that's the memory that I have specifically about that item. That's the only reason I remember it is because I mislabeled them.

Trooper Smith further testified that the appellant's blood sample was not received by the Crime Lab until after Trooper Zain left his employment and that he and Trooper Myers did the comparison testing and analysis.

Upon consideration of the evidence, the circuit court entered an order on January 30, 1996, denying the appellant habeas relief. The circuit court concluded that Trooper Zain's involvement in the underlying case was minimal, at most, and due to the chronology in the case, Trooper Zain could not have manipulated the results of the testing to inculpate the appellant because he never had a blood sample from the appellant, and thus, he could not have known what the appellant's genetic markers were. The circuit court further found that the serological evidence in the case was not a factor in the appellant's conviction and that the non-serological evidence, standing alone, was sufficient to support the appellant's conviction.

Subsequently, on January 9, 1998, Trooper Smith testified before the Grand Jury in the Circuit Court of Kanawha County which was convened to investigate criminal charges against Trooper Zain. The following exchange occurred:

Q: Were you ever requested to write a final report based on Mr. Zain's worksheets?

A: Uh-huh.

Q: Did you do that?

A: Yes, I did.

Q: Did you find any problems with that?

A: Yes and no. I wrote the report based on the worksheets, but yeah I found problems with it.

Q: How did those problems crop up in that instance?

A: Well, the Farmer case is one for example. For example, I was going to tell you. He had listed on his worksheet a full set of genetic markers off a set of fingernail clippings for blood. I mean, I can't tell you how unusual that is. That just made me wonder, wow, that's real unusual. That's strange.

Q: Are you saying that the blood samples would be very minimal—

A: My own experience is we're lucky to get hardly anything off of fingernails. In that case—and then when I looked back through the data on that case, I thought, well, darn there's stuff that I think I should be able to find but can't find.

But at the same time, on that case I actually—it was close in time when the testing was done, I remember doing tests in the case.

I actually remember doing things. And so I thought, well, maybe I screwed up or maybe we lost something or whatever. And so, like I say, I issued the report based on that.

Trooper Myers issued reports. At that point in time, after that incident, it troubled me so much, I came back and I ordered Brent and Jeff, "Do not write any reports that you cannot absolutely verify everything that is on the report."

It troubled me, because I couldn't explain it. And I didn't like being put in the

position if I was asked—no, I didn't like being put in that position. I had no reason to categorically distrust anything that was on that worksheet because that was our main document. That's what we were suppose to use.

But from that time on, we didn't issue any reports that we didn't filter through our own records, whatever that may be, and adjust them accordingly.

Approximately one year later, this Court ordered a third investigation of the Serology Division of the State Police Crime Lab based upon allegations that a state trooper, other than Trooper Zain, had "knowingly falsely testified about nonexistent serology test results supposedly linking a petitioner in a habeas corpus claim to the crime at issue." *Zain III*, 219 W.Va. at 411, 633 S.E.2d at 765. As part of the investigation, ten cases that involved tests and trial testimony of serologists other than Fred Zain were selected for review. One of those cases was that of the appellant. The selected cases were reviewed by Mark Stolorow, Executive Director of Orchid Cellmark Laboratories. His initial conclusions were forwarded to Ronald Linhart, an inspector with the American Society of Crime Laboratory Directors and one of the independent experts in the *Zain I* investigation. They filed a joint report on December 2, 2004 (hereinafter referred to as the "Stolorow/Linhart report"). *Id.*

■ Based on the findings of Mr. Stolorow and Mr. Linhart, the Honorable Thomas A. Bedell, the special judge appointed to conduct the *Zain III* investigation,[8] reported to this Court on September 23, 2005, that " 'there is not a scintilla of evidence of intentional misconduct on the part of the serologists who worked with Fred S. Zain. . . . Although there was [sic] some errors identified in cases reviewed, the Stolorow/Linhart report concluded that the errors were nonprobative in the cases in which they were found.' " *Zain III*, 219 W.Va. at 412, 633 S.E.2d at 766. Accordingly, this Court reaffirmed the holding in Syllabus Point 3 of *Zain II* which states,

Serology reports prepared by employees of the Serology Division of the West Virginia State Police Crime Laboratory, other than Trooper Fred S. Zain, are not subject to the invalidation and other strictures contained in *In the Matter of an Investigation of the West Virginia State Police Crime Laboratory, Serology Division*, 190 W.Va. 321, 438 S.E.2d 501 (1993).

At the same time, this Court also recognized that "the determination that the serology evidence at issue is not subject to the invalidation strictures and systematic review authorized in *Zain I* does not preclude prisoners against whom these serologists offered evidence from seeking habeas corpus relief under our Post–Conviction Habeas Corpus statute, W. Va.Code § 53–4A–1, *et seq.*" *Zain III*, 219 W.Va. at 414–415, 633 S.E.2d at 768–69. Accordingly, this Court held in Syllabus Point 6 of *Zain III* that,

A prisoner who was convicted between 1979 and 1999 and against whom a West Virginia State Police Crime Laboratory serologist, other than Fred Zain, offered evidence may bring a petition for a writ of habeas corpus based on the serology evidence despite the fact that the prisoner brought a prior habeas corpus challenge to the same serology evidence, and the challenge was finally adjudicated.

In this appeal, the appellant acknowledges that his case was one of the ten cases that was specifically examined in *Zain III* and that the special investigators involved in *Zain III* found no probative error. He asserts, however, that he should not be precluded from bringing a *Zain III* claim. He maintains that he is entitled to a full hearing, the taking of evidence, and entry of a comprehensive order by the circuit court which includes detailed findings as to the truth or falsity of the serology evidence.

Based upon a careful review of the record and the *Zain III* decision, this Court finds no error in the denial of the appellant's motion to amend. *Zain III* involved a comprehensive and detailed review of ten cases, includ-

---

8. Judge Bedell actually succeeded the Honorable James O. Holiday who was originally appointed as the special judge to conduct the renewed

investigation of the Crime Lab. *Zain III*, 219 W.Va. at 416, 633 S.E.2d at 770.

ing the appellant's, to ascertain the nature and extent of any misconduct on the part of serologists other than Trooper Zain in the State Crime Lab. Although a substantially greater number of errors were found than had been identified in the *Zain II* investigation, the Stolorow/Linhart report stated that "'there was no discovery of evidence that exculpated an otherwise inculpated defendant'" and "'[t]here are no smoking guns as witnessed with the intentional and egregious misconduct of Fred Zain, at least in these 10 cases under investigation.'" *Zain III,* 219 W.Va. at 411–12, 633 S.E.2d at 765–66.

The contradictory testimony of Trooper Smith during the course of eight years following the appellant's conviction with regard to his personal participation in the testing of some of the evidence was considered and carefully reviewed by Mr. Stolorow and Mr. Linhart during the *Zain III* investigation. 219 W.Va. at 412, n. 6, 633 S.E.2d at 766, n. 6. Regardless of the extent of Trooper Smith's participation in the genetic marker testing of the blood on the victim's fingernails, the fact remains that this evidence never inculpated the appellant. Rather, the testimony given by Trooper Smith with regard to this evidence at the appellant's trial was that the genetic markers found in the blood from the victim's fingernails were consistent with the victim's own genetic markers. The same is true with respect to the other evidence from the victim's residence. Trooper Smith's testimony at the appellant's trial was that all the genetic markers found in the blood on the items from the crime scene were consistent with the genetic markers of the victim. The appellant's genetic markers were only consistent with those genetic markers found in the seminal fluid on his t-shirt and jeans. Simply put, the serological evidence never connected the appellant to the crime scene.

When the fact that the appellant's case was thoroughly reviewed as part of the *Zain III* investigation and no probative error was found is combined with the fact that the serological evidence did not link the appellant to the alleged crimes in the first place, there is clearly no basis to allow the appellant to add a *Zain III* claim to his petition for a writ of habeas corpus. Therefore, the circuit court did not abuse its discretion in denying the appellant's motion to amend.[9]

### B. Denial of Habeas Relief

In his petition for a writ of habeas corpus, the appellant asserted seven grounds as a basis for him granting him relief. W. Va.Code § 53–4A–1(a) (1967) (Repl.Vol.2008) provides, in pertinent part:

> Any person convicted of a crime and incarcerated under sentence of imprisonment therefor who contends that there was such a denial or infringement of his rights as to render the conviction or sentence void under the Constitution of the United States or the Constitution of this State, or both, or that the court was without jurisdiction to impose the sentence, or that the sentence exceeds the maximum authorized by law, or that the conviction or sentence is otherwise subject to collateral attack upon any ground of alleged error heretofore available under the common law or any statutory provision of this State, may, without paying a filing fee, file a petition for a writ of habeas corpus ad subjiciendum[.]

In addition, this Court has explained that "[h]abeas corpus serves as a collateral attack upon a conviction under the claim that the conviction was obtained in violation of the state or federal constitution." *Edwards v. Leverette,* 163 W.Va. 571, 576, 258 S.E.2d 436, 439 (1979). Therefore, "[w]hile our leg-

---

9. In his brief and argument before this Court, the appellant reasserted a *Zain I* claim. He argued that Trooper Smith's testimony at his habeas hearing in 1994 and during the grand jury proceedings in Kanawha County in 1998 established that Trooper Zain had more than a minimal role in his case. A review of the record shows that this issue was not raised below. The appellant never made a *Zain I* claim in his petition or during any of the proceedings before the circuit court. "As a general rule '(t)his Court will not consider questions, nonjurisdictional in their nature, which have not been acted upon by the trial court.' Syl. pt. 1, *Buffalo Mining Co. v. Martin,* 165 W.Va. 10, 267 S.E.2d 721 (1980)." Syllabus Point 3, *Wells v. Roberts,* 167 W.Va. 580, 280 S.E.2d 266 (1981). Because the issue is not properly before this Court, it will not be considered.

islature, through the enactment of *W. Va. Code*, 1931, 53–4A–1 through 11, as amended has provided a broad and effective post-conviction review, we still maintain a distinction, so far as post-conviction remedy is concerned, between plain error in a trial and error of constitutional dimensions. Only the latter can be a proper subject of a habeas corpus proceeding." *Id.* According, Syllabus Point 4 of *State ex rel. McMannis v. Mohn*, 163 W.Va. 129, 254 S.E.2d 805 (1979), holds that "[a] habeas corpus proceeding is not a substitute for a writ of error in that ordinary trial error not involving constitutional violations will not be reviewed." *See also Pethel v. McBride*, 219 W.Va. 578, 588, 638 S.E.2d 727, 737 (2006) ("The right to habeas relief is, by necessity, limited. If it were not, criminal convictions would never be final and would be subject to endless review.").

■ In this case, six of the grounds for relief asserted by the appellant involve alleged trial error. Having carefully and thoroughly reviewed the record in this case, this Court finds that four of those grounds are not subject to habeas review. In particular, this Court finds that the following are ordinary trial errors: denying the appellant's motions for acquittal at the close of the State's case, admitting into evidence the appellant's t-shirt which contained evidence of seminal fluid,[10] allowing the jury to use a magnifying glass, and finding that the prosecutor did not knowingly introduce false testimony of three witnesses, David Tomlin, James Lang, and Lynn Fitzwater.[11] Even if these alleged trial errors were supported by

the record, this Court does not believe that they implicate the appellant's constitutional rights in such a manner as to be reviewable in habeas corpus, and therefore, they will not be addressed. *State ex rel. Wimmer v. Trent*, 199 W.Va. 644, 487 S.E.2d 302 (1997). *See also State ex rel. Edgell v. Painter*, 206 W.Va. 168, 522 S.E.2d 636 (1999) (finding that denial of motion for acquittal is not a proper ground to assert in a habeas proceeding); *Hatcher v. McBride*, 221 W.Va. 5, 11, 650 S.E.2d 104, 110 (2006), *quoting Grundler v. North Carolina*, 283 F.2d 798, 802 (4th Cir.1960) (observing that "[a]bsent 'circumstances impugning fundamental fairness or infringing specific constitutional protections,' admissibility of evidence does not present a state or federal constitutional question.").[12]

On the other hand, the appellant's contention that the trial court erred in admitting statements he gave while incarcerated in a New Jersey prison and his assertion that a biased juror should have been disqualified are claims that do rise to a constitutional level. Therefore, these two claims along with the appellant's alleged error regarding his sentences will be considered below.

### 1. Admission of Appellant's Statements Given at New Jersey's Bayside Prison

■ The appellant contends that the trial court erred in admitting into evidence at trial the statements he gave to Corporal Jeffries and Deputy Shirley on June 8, 1989, while he was incarcerated in New Jersey's Bayside Prison on unrelated charges.[13] The appel-

---

10. At trial, the appellant objected to the admission of his t-shirt into evidence on the basis that it was improperly seized. The appellant also objected to Trooper Smith's testimony regarding the results of the serology tests on the t-shirt because he did not conduct the tests. The trial court ruled that the t-shirt was seized by voluntary consent and that Trooper Smith's testimony that he participated in the testing of this evidence resolved the objection regarding the test results. In his habeas petition, the appellant asserted that the t-shirt should not have been admitted into evidence because it was irrelevant and highly prejudicial. The record shows, however, that the appellant never objected at trial to the admission of the t-shirt on the basis that it was irrelevant and highly prejudicial.

11. The records shows that the appellant never offered any evidence to support his contention

that the testimony given by these three witnesses was false.

12. It is noted that the circuit court thoroughly reviewed each of these claims and found no error. This Court does not disagree with the circuit court's findings regarding these claims, but simply declines to address them because the appellant's constitutional rights are not implicated. *See Wimmer*, 199 W.Va. 644, 487 S.E.2d 302.

13. When the appellant was interviewed at the prison, both officers asked him questions and wrote down his answers. Thus, there were two statements presented at trial that resulted from the June 8, 1989, interview.

lant maintains that he asserted his right to an attorney but that the officers continued to ask him questions in violation on his constitutional rights.[14] In the final order denying the appellant habeas relief, the circuit court found that the statements were voluntarily given and all rights had been waived. The circuit court noted that the appellant was not under arrest for any charges related to the murder of Ms. Bouldin at the time he was questioned and that he had signed a *Miranda* waiver form. In reaching its decision, the circuit court relied upon Syllabus Point 3 of *State v. Middleton,* 220 W.Va. 89, 640 S.E.2d 152 (2006), which holds:

> A police officer may continue to question a suspect in a noncustodial setting, even though the suspect has made a request for counsel during the interrogation, so long as the officer's continued questioning does not render statements made by the suspect involuntary.

In this appeal, the appellant argues that he was clearly in a custodial setting when he was interviewed by Corporal Jeffries and Deputy Shirley on June 8, 1989, because he was in a New Jersey prison and therefore, the officers should have stopped questioning him when he requested an attorney. Upon a careful and thorough review of the record, this Court finds that it is not necessary to delve into the issue of the appellant's custodial status at the time he was questioned at the Bayside Prison. Assuming, arguendo, that the appellant's statements should have been suppressed, this Court finds that their admission into evidence at trial was, at worst, harmless error.[15] Moreover, the statements at issue did not inculpate the appellant.

As noted above, the appellant was questioned by the police on two separate occasions. The first interview occurred on April 16, 1988, in a police cruiser outside of the appellant's home. The second interview occurred on June 8, 1989, at the Bayside Prison. All of the statements were admitted into evidence at trial. However, none of the statements that the appellant gave to Corporal Jeffries and Deputy Shirley were confessions. Instead, the appellant specifically denied committing the alleged offenses.

The relevant information obtained during the second interview of the appellant while he was in the Bayside Prison concerned his comings and goings on the evening of April 14, 1988. In that regard, the appellant told the officers that he had left the Grims' home for about forty-five minutes on the night in question to go to Sonny Pumphrey's trailer. The record shows, however, that this information was also provided by the appellant in his first statement to the police officers on April 16, 1988. In the first statement, the appellant initially said that he was at the Grim home during the entire evening of April 14, 1988. When questioned further, he acknowledged that he had left the Grim home for a short time to go to Mr. Pumphrey's trailer. Given the fact that the information contained in the second statement had already been presented to the jury through the admission of the April 16, 1988, statement, this Court finds that the second statement was merely cumulative evidence.[16]

Upon a further review of the record, it is also clear that the evidence contained in the appellant's second statement was not critical to the jury's consideration of the evidence

**14.** The Fifth Amendment of the United States Constitution provides, in pertinent part, "[n]o person ... shall be compelled in any criminal case to be a witness against himself[.]" Article III, § 5 of the West Virginia Constitution states, "nor shall any person, in any criminal case, be compelled to be a witness against himself[.]"

**15.** " 'This Court may, on appeal, affirm the judgment of the lower court when it appears that such judgment is correct on any legal ground disclosed by the record, regardless of the ground, reason or theory assigned by the lower court as the basis for its judgment.' Syllabus point 3, *Barnett v. Wolfolk,* 149 W.Va. 246, 140 S.E.2d

466 (1965)." Syllabus Point 2, *Adkins v. Gatson,* 218 W.Va. 332, 624 S.E.2d 769 (2005).

**16.** While the Appellant also told the officers during the June 8, 1989, interview that he had walked down by the river and did not see anyone, that statement was not, in and of itself, contradicted by the testimony of three other witnesses at trial who stated that they observed the appellant walking in the victim's neighborhood. Obviously, the jury could have believed both to be true. Therefore, the admission of this evidence through the second statement did not prejudice the appellant in any way.

and its finding of guilt. In that regard, the State presented other evidence which actually placed the appellant in the victim's home. Both James Lang and David Tomlin testified that the appellant said that he had broken into the victim's house but that he did not kill her. In light of this evidence, the appellant's statements to the police officer while he was incarcerated in the New Jersey prison were not necessary to establish that he had the opportunity to commit the alleged offenses.

■ This Court has held that "[f]ailure to observe a constitutional right constitutes reversible error unless it can be shown that the error was harmless beyond a reasonable doubt." Syllabus Point 5, *State ex rel. Grob v. Blair*, 158 W.Va. 647, 214 S.E.2d 330 (1975). Based on all the above, it is clear that the admission of the statements the appellant gave while he was incarcerated in New Jersey's Bayside Prison into evidence at his trial was harmless. Therefore, the circuit court did not abuse its discretion in finding no error.

### 2. Refusal to Disqualify Juror

■ The appellant also argues that the circuit court erred by not finding that his constitutional right to an impartial jury [17] was violated when the trial court refused to strike Juror Cook. As noted above, Juror Cook informed the trial court during the first day of the appellant's trial that the bank where she was employed was administering Ms. Bouldin's estate and her boss was concerned that she had a conflict of interest. Juror Cook stated, however, that she could remain impartial. The appellant contends that Juror Cook should have nevertheless been excused from the jury panel pursuant to *O'Dell v. Miller*, 211 W.Va. 285, 565 S.E.2d 407 (2002). In particular, the appellant relies upon this Court's statement in *O'Dell* that "[i]t is not for the juror to decide whether he can render a verdict solely on the evidence. The discretion to decide whether a prospective juror can render a verdict solely on the

evidence is an issue for the trial judge to resolve." 211 W.Va. at 289, 565 S.E.2d at 411. The appellant argues that, given the circumstances, Ms. Cook should have been excused from the jury panel and the trial court did not do so because there was no longer an alternate juror available to replace her.

■ Syllabus Point 5 of *O'Dell* states that "[o]nce a prospective juror has made a clear statement ... reflecting or indicating the presence of a disqualifying prejudice or bias, the prospective juror is disqualified as a matter of law and cannot be rehabilitated by subsequent questioning, later retractions, or promises to be fair." In this instance, there is no indication that Ms. Cook expressed prejudice or bias. Rather, she merely reported the concerns of her boss, maintaining that she could be fair and impartial. Because Juror Cook did not express prejudice or bias, *O'Dell* does not apply. *See State v. Newcomb*, 223 W.Va. 843, 679 S.E.2d 675 (2009) (also holding that absent any indication of prejudice or bias, a juror is not disqualified). Moreover, this Court has held:

> "A trial court's failure to remove a biased juror from a jury panel does not violate a defendant's right to a trial by an impartial jury as guaranteed by the Sixth and Fourteenth Amendments to the United States Constitution and by Section 14 of Article III of the West Virginia Constitution. In order to succeed in a claim that his or her constitutional right to an impartial jury was violated, a defendant must affirmatively show prejudice." Syl. Pt. 7, *State v. Phillips*, 194 W.Va. 569, 461 S.E.2d 75 (1995).

Syllabus Point 6, *State ex rel. Quinones v. Rubenstein*, 218 W.Va. 388, 624 S.E.2d 825 (2005). As discussed, the appellant has failed to affirmatively show prejudice on the part of Juror Cook. Accordingly, the circuit court did not abuse its discretion in finding that the trial court properly denied the appellant's motion to disqualify Juror Cook.[18]

---

**17.** The Sixth Amendment of the United States Constitution provides, in pertinent part: "In all criminal prosecutions, the accused shall enjoy the right to a speedy and public trial, by an impartial jury[.]"

**18.** Notwithstanding the absence of any evidence of prejudice on the part of Ms. Cook, the appellant offered no evidence to support his contention that the trial court's decision to not excuse

### 3. *Sentencing*

 Finally, the appellant contends that the sentences imposed upon him by the trial court violate Article III, § 5, of the West Virginia Constitution.[19] Specifically, the appellant argues that the jury intended him to be eligible for parole by recommending mercy on the first degree murder conviction and that the trial court exceeded its authority by imposing consecutive sentences which will, in effect, keep him imprisoned for the rest of his life. In other words, the appellant argues that by imposing consecutive sentences, the trial court frustrated the intent and purpose of the jury's recommendation of mercy.

Upon review of the record, we find no merit to the appellant's argument. The trial court sentenced the appellant to life with mercy for the murder conviction in accordance with the jury's recommendation. Likewise, the trial court sentenced the appellant for his other convictions in accordance with the applicable statutes, W. Va.Code § 61–3–11 (1973) (Repl.Vol.1989) and W. Va. Code § 61–8B–3 (1984) (Repl.Vol.1989).[20] This Court has had held that " '[w]hen a defendant has been convicted of two separate crimes, before sentence is pronounced for either, the trial court may, in its discretion, provide that the sentences run concurrently, and unless it does so provide, the sentences will run consecutively.' Syllabus point 3, *Keith v. Leverette,* 163 W.Va. 98, 254 S.E.2d 700 (1979)." Syllabus Point 3, *State v. Allen,* 208 W.Va. 144, 539 S.E.2d 87 (1999). *See also* W. Va.Code § 61–11–21 (1923) (Repl. Vol.2005). The trial court clearly acted within its discretion when it ordered that the appellant's sentences be served consecutively as opposed to concurrently. Therefore, the

circuit court did not abuse its discretion in denying the appellant habeas relief.

### IV.

### CONCLUSION

Accordingly, for all the reasons set forth above, the final order of the Circuit Court of Jefferson County entered on August 15, 2007, is affirmed.

Affirmed.

---

Juror Cook was influenced by the fact that an alternate juror was not available.

19. Article III, Section 5 of the West Virginia Constitution, states, in pertinent part: "Excessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishment inflicted. Penalties shall be proportioned to the character and degree of the offense."

20. When the appellant was sentenced in 1990, W.Va.Code § 61–3–11(a) (1973) (Repl.Vol.1989) provided, in pertinent part: "Burglary shall be a felony and any person convicted thereof shall be confined in the penitentiary not less than one nor

more than fifteen years." In addition, W. Va. Code § 61–8B–3 (1984) (Repl.Vol.1989) provided, in pertinent part: "Any person who violates the provision of this section shall be guilty of a felony, and upon conviction thereof, shall be imprisoned in the penitentiary not less than fifteen nor more than twenty-five years." Both statutes have since been amended, but the sentence for burglary remains the same. W. Va. Code § 61–3–11 (1993) (Repl.Vol.2005). However, the sentence for first degree sexual assault is now "not less than fifteen nor more than thirty-five years." W. Va.Code § 61–8B–3 (2006) (Supp.2009).